UNITED STATES of America, Appellee,

v.

Robert W. SLOCUM, Defendant-Appellant.

No. 248, Docket 82–1161.

United States Court of Appeals, Second Circuit.

Argued Sept. 3, 1982.

Decided Dec. 10, 1982.

Certiorari Denied Feb. 28, 1983. See 103 S.Ct. 1260.

652

Frederick H. Block, New York City, for defendant-appellant.

Samuel S. Linderman, Asst. U.S. Atty., New York City (John S. Martin, Jr., U.S. Atty. for the S.D. of N.Y., Walter P. Loughlin, Asst. U.S. Atty., New York City, on the brief), for appellee.

Before KEARSE, CARDAMONE and WINTER, Circuit Judges.

CARDAMONE, Circuit Judge:

It is often stated that if something is too good to be true, it probably isn't. Sadly, several hundred investors learned this lesson the hard way in the case before us. Operating on a well-known premise so tellingly phrased by P.T. Barnum, appellant conceived an elaborate Ponzi-like scheme and offered it to the public as a sure route to get rich quickly. Lured by promised profits of 100 percent in 90 days, "investors" eagerly bought securities in appellant's shell corporation. Only after being duped out of over three million dollars did the victims realize that this was not the road to riches they had imagined.

I

The facts at trial established that in 1975 appellant Robert W. Slocum, with the assistance of an attorney named Humberto Pacheco, formed International Trade Development of Costa Rica, S.A. (ITD) as a Costa Rican corporation. Slocum told Pacheco that ITD would engage in the business of importing Costa Rican wood crafts into the United States and that no outside financing of ITD would be used. Shortly after ITD's incorporation, however, Slocum began an

extensive campaign of soliciting outside investments in ITD. As its president, he recruited an investment sales force, invited potential investors to presentations in Costa Rica and New York City extolling ITD's purported prospects, ran ITD advertisements in newspapers (e.g., a full page advertisement on July 4, 1976 in the New York Times Sunday Magazine Section) and opened showrooms for investors to visit in New York and Miami. Slocum and his salesmen encouraged investors to make their investments in cash and falsely told potential investors that they would double their investments in 90 days.[1] Potential investors were also urged to act quickly because, they were told, the rate of return on their investments would soon decline from 100 to 50 percent. Numerous other fraudulent representations were made to investors, including that ITD had extensive orders for merchandise, had several factories in Costa Rica, and owned and was developing land in that Central American country. In fact, ITD never conducted any business other than that necessary to maintain a facade of legitimacy.

Worthless certificates designated "CRDs" were issued to ITD investors. Some were told that the initials "CRD" stood for Costa Rican Deposit; others were informed that "CRD" meant Costa Rican Development. The certificates, printed in a mixture of Spanish and English, contained blank spaces in which the name of the investor, the investment maturity date (90 days from the date of investment), the amount to be repaid (twice the amount invested) and the salesman's name were filled in at the time of purchase. The securities listed as ITD's treasurer one "Alfredo M. Cortina," a fictitious person. No attempt was made to register the certificates with the Securities and Exchange Commission (SEC).

When investors began pressing Slocum and his salesmen for return of their investments, they were variously and again falsely advised that Slocum was about to conclude an oil deal to generate new funds,

1. Several early investors did double their money. Obviously impressed, they agreed to "roll over" their investments, buy additional stock and induce others to invest.

that he was going to Europe to obtain 40 million dollars so that they could be repaid, and that ITD's lucrative investments would soon pay off. In an attempt to generate operating funds Slocum sent Robert Angona, president of Costa Rican Imports of New York,[2] and Frank Casey, one of Slocum's investment salesmen, to New York City to negotiate a fraudulent letter of credit. Angona and Casey presented the falsified letter of credit at Irving Trust Company in New York, but the bank refused to honor it. This attempt having failed, Slocum sent Edward Ekmalian, Angona's assistant, to Bogota, Columbia to negotiate the fake letter of credit there. This mission was also unsuccessful. Undaunted, Slocum, Angona and Ekmalian established an account for Costa Rican Imports of New York at Irving Trust and deposited into it two worthless checks drawn on ITD's account at City National Bank of Coral Gables, Florida. The checks were signed by Don Gordon, an ITD official, and Rita Slocum, appellant's wife. Angona and Ekmalian then withdrew the proceeds before the checks were dishonored by the drawee bank. This money was delivered to Slocum.

On November 24, 1981 a federal grand jury returned a 19 count indictment against Slocum and others for their role in the ITD fraud. Count one charged Slocum, his wife, and Henry Ming Wong, an ITD official, with conspiring to sell to the public unregistered securities and employing fraudulent means to effect such sales in violation of 15 U.S.C. §§ 77e, 77q, 77x, 78j(b), 78ff and 17 C.F.R. § 240.10b–5. Slocum alone was charged in count two with mail fraud in violation of 18 U.S.C. §§ 2, 1341; in counts three through seven with the sale of unregistered securities in violation of 15 U.S.C. §§ 77e, 77q, 77x and 18 U.S.C. § 2; in counts eight through twelve with employing fraudulent means to effect the foregoing sales in violation of 15 U.S.C. §§ 78j(b), 78ff, 17 C.F.R. 240.10b–5, and 18 U.S.C. § 2; in counts thirteen and fourteen with

interstate transportation of the proceeds of the foregoing sales in violation of 18 U.S.C. §§ 2, 2314; and in count fifteen with the commission of wire fraud in violation of 18 U.S.C. §§ 2, 1343. Count sixteen charged Slocum, his wife and Ming Wong with causing other persons to travel across state lines in furtherance of a scheme to defraud in violation of 18 U.S.C. §§ 2, 2314. Count seventeen charged Slocum and his wife with conspiring to defraud several banks in violation of 18 U.S.C. § 371. Lastly, counts eighteen and nineteen charged Slocum and his wife with bank fraud in violation of 18 U.S.C. § 1014.

Following his trial in the United States District Court for the Southern District of New York before the Honorable Henry F. Werker and a jury, Slocum was convicted on counts two through nineteen. A mistrial was declared on count one after the jury was unable to agree. Judge Werker subsequently sentenced Slocum to an aggregate sentence of twelve years as follows: concurrent three-year terms on counts two through twelve, fifteen and seventeen; concurrent seven-year terms on counts thirteen, fourteen and sixteen to run consecutively to the three-year terms on counts two through twelve, fifteen and seventeen; and concurrent two-year terms on counts eighteen and nineteen to run consecutively to the three and seven-year terms.

## II

Appellant raises several issues on appeal. First, he correctly contends, and the government concedes, that his convictions for bank fraud in violation of 18 U.S.C. § 1014 must be reversed. Section 1014 provides in pertinent part:

Whoever knowingly makes any false statement or report, or willfully overvalues any . . . property or security, for the purpose of influencing in any way the action of . . . any bank the deposits of which are insured by the Federal Deposit

---

2. In addition to forming ITD, Slocum established or controlled a number of other shell corporations. At least four of these corporations, Empire Bancorporation, St. George Im-

ports, Miami Costa Rican Imports, and Costa Rican Imports of New York, were used by Slocum in the perpetration of the scheme to defraud.

Insurance Corporation ... upon any application, advance, discount, purchase, purchase agreement, repurchase agreement, commitment, or loan, or any change or extension of any of the same, by renewal, deferment of action or otherwise, or the acceptance, release, or substitution of security therefor, shall be fined not more than $5,000 or imprisoned not more than two years, or both.

18 U.S.C. § 1014 (1976). The substantive bank fraud counts against Slocum were based entirely upon the two instances in which Slocum, through his agents Angona and Ekmalian, kited bad checks at Irving Trust. The debate has now been settled as to whether a "bad check" deposited in a federally insured bank is a "false statement" or constitutes "overvaluing" of property or security violative of 18 U.S.C. § 1014. The Supreme Court recently held that such a check—even when deposited as part of a check-kiting scheme—does not constitute a false statement or an overvaluing of property or security within the meaning of § 1014. *See Williams v. United States,* —— U.S. ——, 102 S.Ct. 3088, 3092–95, 73 L.Ed.2d 767 (1982); *cf. United States v. Krown,* 675 F.2d 46, 51 (2d Cir.1982) (merely depositing worthless checks in FDIC-insured bank does not violate § 1014).[3] Consequently, Slocum's two year sentence for bank fraud must be vacated.

■ Appellant next argues that his conviction on count seventeen for conspiracy to defraud FDIC-insured banks in violation of 18 U.S.C. § 371 must be reversed because the two instances of check-kiting, cited as overt acts in furtherance of the conspiracy, did not violate § 1014. Overt acts, however, stand on a different footing. The fact that Slocum's check-kiting scheme did not violate § 1014 does not mean that the kitings cannot be considered as overt acts in furtherance of the conspiracy to defraud an FDIC-insured bank. An overt act need not "be the substantive crime charged in the indictment as the object of the conspiracy"—nor need it even be a criminal act—in order to support a conspir-

acy conviction. *Yates v. United States,* 354 U.S. 298, 334, 77 S.Ct. 1064, 1084, 1 L.Ed.2d 1356 (1957). The reason for this is that the function of the overt act is simply to demonstrate the conspiracy's existence, i.e., to prove that it is at work. *See id.* Additionally, even were the check-kitings not deemed overt acts in furtherance of a conspiracy to defraud, evidence of a separate overt act to support a conviction under count seventeen is found in the presentation and attempted negotiation by Slocum's agents of the fraudulent letter of credit.

Slocum also asserts that since the two bank fraud counts against him should have been dismissed, the trial court erred when it admitted testimony concerning his check-kiting activities. The evidence regarding kiting, however, was independently admissible as relevant evidence of the existence and operation of the conspiracy to defraud banks charged in count seventeen. Further, the same testimony was also admissible to prove Slocum's association with Casey, Angona and Ekmalian; the interlocking relationship between Slocum's various corporations; and his control over ITD.

### III

■ Slocum further challenges his remaining convictions as not supported by sufficient evidence. Specifically he asserts that ITD was a legitimate business and that he was advised by John Corrigan, a Florida attorney, that ITD's securities did not have to be registered with the SEC.

On appeal the evidence must be viewed in the light most favorable to the government, *see Glasser v. United States,* 315 U.S. 60, 80, 162 S.Ct. 457, 469, 86 L.Ed. 680 (1942), and all issues of credibility must be considered within the exclusive province of the jury, *United States v. Sprayregen,* 577 F.2d 173, 174 (2d Cir.), *cert. denied,* 439 U.S. 979, 99 S.Ct. 563, 58 L.Ed.2d 649 (1978). The government produced ample evidence at trial of appellant's guilt. This evidence included Slocum's numerous misrepresentations to ITD investors, both directly and

---

**3.** Both *Williams* and *Krown* were decided after

Slocum's conviction in the instant case.

through his agents; his misrepresentations to Pacheco regarding ITD's need for outside financing; the blatantly fraudulent nature of the "CRDs" marketed by Slocum and his sales force; Slocum's preference for cash from investors; and the minuscule percentage of investors' money actually returned or used for bona fide business purposes by ITD.[4]

With respect to Slocum's contention that he lacked any intent to defraud because he had been advised that the "CRDs" did not have to be registered, we note that this claim relates only to those counts in which intent to defraud is an essential element, i.e., counts two, eight through twelve, fifteen, and sixteen.[5] At trial Corrigan repeatedly denied having given Slocum such advice. Although Corrigan's testimony on this point was contradicted by other witnesses, the decision as to whom to believe was solely within the jury's province. *See id.* Moreover, we fail to see how Slocum's ignorance of the SEC registration requirements, even if true, negates the other overwhelming government evidence from which the jury could have inferred his intent to defraud investors.

## IV

 Claiming a variety of alleged errors at trial, appellant further argues that he was denied a fair trial and due process. First, he contends that the introduction of certain out-of-court statements made by Slocum's nontestifying codefendant, Ming Wong, violated the *Bruton* rule. In *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the Supreme Court held that the admission of a nontestifying codefendant's statements violates the defendant's rights under the confrontation clause of the Sixth Amendment if the statements

are "powerfully incriminating" or "devastating" to the defendant. 391 U.S. at 135–36, 88 S.Ct. at 1627–28. Merely instructing the jury in such cases that the statements are to be considered only against their maker and not against the defendant fails to safeguard adequately the defendant's Sixth Amendment rights. *See id.* A *Bruton* violation, however, occurs only when the statement is both " 'clearly inculpatory' " of the defendant and " 'vitally important' " to the prosecution's case. *United States v. Marin,* 669 F.2d 73, 83 (2d Cir.1982); *United States v. Knuckles,* 581 F.2d 305, 313 (2d Cir.), *cert. denied,* 439 U.S. 986, 99 S.Ct. 581, 58 L.Ed.2d 659 (1978).

 Ming Wong's statements were not "clearly inculpatory." They merely referred to ITD's inability to return investors' funds, its lack of legitimate business activities, and the inaccuracy of its books. Nowhere was Slocum mentioned by name. Appellant argues that Ming Wong's references to ITD necessarily implicated him because other government evidence showed that Slocum controlled ITD's activities. These references are insufficient to incriminate Slocum inasmuch as the well-established rule in our Circuit is that a codefendant's statements must be "clearly inculpatory" *standing alone* for *Bruton* to apply. *See United States v. Knuckles,* 581 F.2d at 313; *United States v. Wingate,* 520 F.2d 309, 314 (2d Cir.1975), *cert. denied,* 423 U.S. 1074, 96 S.Ct. 858, 47 L.Ed.2d 84 (1976). Where, as here, the inculpatory impact upon the defendant of the statements is defused because it depends upon other prosecution evidence to connect the defendant to the subject of the statements, the *Bruton* Rule is not violated. *See Knuckles,* 581 F.2d at 313. Moreover, even if Ming

---

4. We do not believe that the jury's inability to reach a verdict on count one in any way undermines the sufficiency of evidence against appellant on the related substantive offenses charged in counts two through sixteen. Count one, which charged appellant with conspiring to sell unregistered securities, required the government to prove the existence of an agreement between Slocum and others to sell such securities. The mistrial on count one could

have resulted from a lack of evidence as to such an agreement, and not from a failure to show Slocum's personal involvement in ITD's fraudulent security sales.

5. Slocum's ignorance of the SEC's registration requirements is of course no defense to the counts charging him with illegal sales of unregistered securities.

Wong's statements were "clearly inculpatory" of Slocum, they could hardly be termed vital to the government's case in light of the other extensive evidence against him.

Second, Slocum claims that the district court denied him a fair trial by refusing to give certain requested jury instructions. Citing *United States v. Swiderski*, 539 F.2d 854, 859–60 (2d Cir.1976), appellant claims that he was deprived of a fair trial when the trial court declined to charge the jury that accomplice testimony against him had to be carefully scrutinized. This discretionary charge is not required in all cases, but only in those where, by failing to give the charge, the defendant "suffered substantial prejudice." *United States v. LaSorsa*, 480 F.2d 522, 527 (2d Cir.), *cert. denied*, 414 U.S. 855, 94 S.Ct. 157, 38 L.Ed.2d 105 (1973); *see also United States v. Velez*, 652 F.2d 258, 261 n.5 (2d Cir.1981). On balance any prejudice to Slocum from the district court's refusal to give the requested charge was minimal. The witnesses in question—Casey, Gordon, and Angona—had no obvious incentive or pressure upon them to testify falsely against Slocum since they were neither paid informants nor his co-defendants. Nor can they be viewed as potential defendants who testified in exchange for immunity or prosecutorial leniency because the government failed to prosecute them within the applicable statute of limitations. The credibility of no single witness was vital to the government's case and substantial corroboration existed for the testimony of each. Judge Werker did instruct the jury on their duty to pass upon the credibility of all of the witnesses and specifically charged that bias or interest in the outcome of the case on the part of a witness must be considered in evaluating that witness' credibility. In light of this, the trial court's refusal to give the requested charge does not appear to have substantially prejudiced appellant.

Appellant's remaining objections to the jury instructions are equally meritless. We comment only on his contention that the trial court should have charged the jury that an acquittal on the conspiracy count (count one) would mandate acquittal on the other substantive counts. Since the conspiracy and substantive counts required proof of different elements they did not constitute the same offense for double jeopardy purposes, *see Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932). Thus, contrary to appellant's assertion, an acquittal on count one would not have mandated acquittal on the other counts.

Also, appellant unconvincingly claims that Judge Werker's refusal to grant his motion for a third pretrial continuance denied him a fair trial. A district court has broad discretion in determining whether or not to grant a continuance. *See Ungar v. Sarafite*, 376 U.S. 575, 589, 84 S.Ct. 841, 849, 11 L.Ed.2d 921 (1964). Its ruling on such a motion will not be reversed, absent an abuse of discretion. *See id.* Here two previous defense requests for pretrial continuances were granted and appellant was permitted nearly three months to prepare for trial after counsel was appointed. In light of this, we do not believe that the district court abused its discretion in denying appellant's continuance motion.

V

We next consider whether appellant's consecutive sentences on count two, and counts thirteen and fourteen constitute impermissible multiple punishment in violation of the double jeopardy clause because they resulted from the same criminal conduct. Whether a federal defendant may be subject to multiple punishment for separate statutory violations arising out of the same criminal conduct is a question of congressional intent. Where Congress intends multiple punishment, imposition of cumulative sentences does not violate the Constitution. *United States v. Alexandro*, 675 F.2d 34, 42 (2d Cir.1982); *see Albernaz v. United States*, 450 U.S. 333, 344, 101 S.Ct. 1137, 1145, 67 L.Ed.2d 275 (1981). Absent other forms of congressional guidance, none of which are present in this case, courts must look to the *Blockburger* rule to determine whether multiple punishment is in-

tended. The applicable rule under *Block-burger* is that "where the same act or trans-action constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two of-fenses or only one, is whether each provi-sion requires proof of a fact which the other does not." *Blockburger,* 284 U.S. at 304, 52 S.Ct. at 182 (citation omitted).

The offenses of mail fraud in viola-tion of 18 U.S.C. § 1341 and interstate transportation of the proceeds of illegal se-curities sales in violation of 18 U.S.C. § 2314 both require proof of different ele-ments.[6] Section 1341 requires the govern-ment to prove use of the mails. Section 2314 does not. The movement of money or property across state lines must be estab-lished under § 2314, but is not required under § 1341. Thus, § 1341 and § 2314 are not the "same offense," but rather are "two offenses" within the standard of *Blockburger.* Cumulative sentences for the offenses were therefore properly imposed.

## VI

Finally, we are unable to accept Slocum's contention that his aggregate twelve year sentence was cruel and unusual punishment. There is no claim that the sentence was illegally imposed, in excess of the applicable statutory maximum, based upon materially incorrect information or the result of a constitutionally defective sentencing procedure. The claim here is simply that the sentence was too harsh. Slocum was convicted of a deliberate and large-scale fraud involving hundreds of vic-tims. Ordinarily, we decline to interfere with the exercise of a trial court's sentenc-ing power on this type of claim, *see United States v. Seijo,* 537 F.2d 694, 700 (2d Cir. 1976), *cert. denied,* 429 U.S. 1043, 97 S.Ct. 745, 50 L.Ed.2d 756 (1977), and we decline to do so here.

Accordingly, the judgment below is af-firmed on all counts except counts eighteen and nineteen. Judgment on those counts is reversed and the case is remanded to the district court with instructions to vacate the sentence imposed on those counts.

**6.** Section 1341 provides as follows:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representa-tions, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, sup-ply, or furnish or procure for unlawful use any ... obligation, security, or other article ... for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depos-itory for mail matter, any matter or thing ... or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

18 U.S.C. § 1341 (1976).

Section 2314 provides:

Whoever transports in interstate or foreign commerce any ... securities or money, of the value of $5,000 or more, knowing the same to have been ... taken by fraud; or

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representa-tions, or promises, transports or causes to be transported, or induces any person to travel in, or to be transported in interstate com-merce in the execution or concealment of a scheme or artifice to defraud that person of money or property having a value of $5,000 or more; or

Whoever, with unlawful or fraudulent in-tent, transports in insterstate or foreign com-merce any falsely made, forged, altered, or counterfeited securities or tax stamps, know-ing the same to have been falsely made, forged, altered, orcounterfeited; ...

....

Shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

18 U.S.C. § 2314 (1976).