**Joseph PRUSHINOWSKI, Petitioner,**

v.

**UNITED STATES of America, Respondent.**

Nos. 82 Civ. 4858 (VLB), 80 Crim. 770 (VLB).

United States District Court, S.D. New York.

March 11, 1983.

Gallop, Dawson, Kimelman & Clayman, New York City, for petitioner.

John S. Martin, Jr., U.S. Atty., S.D.N.Y., New York City, for U.S.

MEMORANDUM ORDER

VINCENT L. BRODERICK, District Judge.

I.

Petitioner Joseph Prushinowski moves to vacate, under 28 U.S.C. § 2255, his conviction, upon guilty plea, for mail fraud (18 U.S.C. § 1341) and false statements to a federally insured bank (18 U.S.C. § 1014). In his memorandum of law petitioner also

urges the conditions of his confinement as a basis for relief.

## II.

On July 17, 1981 Joseph Prushinowski pled guilty to three counts of an indictment charging mail fraud (Count 1), and false statements to Manufacturers Hanover Trust Company ("Manufacturers"), a federally insured bank (Counts 18 and 23). He was sentenced on October 27, 1981 to three years on the mail fraud count, and to one year each on the false statement counts. The sentences on the false statement counts were to run concurrently, with each other and with the sentence imposed on the mail fraud count.

The charges to which Mr. Prushinowski pled guilty were interrelated in that the fraudulent scheme set forth in the mail fraud count (Count 1) was incorporated by reference and realleged in the false statement counts (Counts 18 and 23).

At the time of plea petitioner admitted his guilt not only with respect to the three counts to which he pled, but also with respect to the other 20 counts of the indictment.

The mail fraud count of the indictment (Count 1) charged, in substance, the following:

From August, 1975, until December, 1975, in the Southern District of New York and elsewhere, Mr. Prushinowski devised a scheme to defraud and to obtain money and property from Manufacturers by means of false and fraudulent pretenses, representations and promises. The principal object of the fraudulent scheme was substantially to enrich Mr. Prushinowski at the expense of Manufacturers. To that end, on September 2, 1975, Mr. Prushinowski opened a checking account at Manufacturers in the name of DJY Trading Company. He was the sole signator. Thereafter, in the course of seeking, and for the purpose of obtaining, a line of credit in that account at Manufacturers, Mr. Prushinowski presented to Manufacturers fictitious financial statements of DJY Trading Company and of his own company, BMH Trading Corporation. On September

10, 1975, Mr. Prushinowski and DJY Trading Company were granted a $300,000 demand loan by Manufacturers which has never been repaid.

From October 7, 1975, up to December 5, 1975, Mr. Prushinowski prepared, or caused to be prepared, at least ten checks made payable to DJY Trading Company, in the total amount of $4,316,000, knowing that the checks were worthless and that the accounts on which they were drawn did not exist. The makers' signatures on these checks were illegible and unauthorized, and insufficient funds were in the accounts underlying the checks to cover the amounts of the checks drawn. During this same period Mr. Prushinowski presented other worthless checks to Manufacturers in a total amount of approximately $3 million.

The face amounts of the ten checks, totalling $4,316,000, were credited by Manufacturers to the account of DJY Trading Company, either as advances or as deposits. The checks were drawn on foreign and out-of-state banks so that the normal delay incident to bank collection provided Mr. Prushinowski with ample time to effectuate the fraudulent scheme. Ultimately, the checks were returned unpaid to Manufacturers for a variety of reasons, including signature of the drawer unknown, no account on file, and insufficient funds.

During the period when Mr. Prushinowski deposited and received advances in credit for the worthless checks, he wrote checks on the DJY Trading account which were paid by Manufacturers. As a result of the deposit of the worthless checks into the Manufacturers account, and of the checks that Mr. Prushinowski wrote on that account, an overdraft in the amount of $1,248,000 was created which, as of the date of the indictment, remained.

The purpose of the scheme was, as Mr. Prushinowski knew, to defraud Manufacturers of substantial sums of money. By the means set forth in the indictment and by other means Mr. Prushinowski enriched himself at the expense of Manufacturers, advanced the object of his fraudulent scheme, and attempted to conceal his fraud.

For the purpose of executing and attempting to execute the fraudulent scheme, Mr. Prushinowski caused to be mailed letters and correspondence containing the worthless checks which were sent by Manufacturers by mail to out-of-state and international banks for collection, and other correspondence relating to the collection process.

The false statement counts of the indictment (Counts 18 and 23), after incorporating those portions of Count 1 which set forth the fraudulent scheme, went on to allege, in substance, the following:

Mr. Prushinowski unlawfully, willfully and knowingly made and caused to be made false statements and reports and did willfully overvalue securities for the purpose of influencing the actions of Manufacturers upon advances, discounts, purchases and loans, in that he deposited and otherwise negotiated the following checks at Manufacturers and received funds and monies therefrom, knowing full well that they were worthless: with respect to Count 18, a check dated November 13, 1975 in the amount of $263,-000 made by Y. Flohr with DJY Trading Company as payee and drawn on the Ozar Bank of Israel; with respect to Count 23, a check dated December 17, 1975 in the amount of $1,500,000 made by D. Denenberg, DJY Trading Company as payee, and drawn on the Chase Manhattan Bank of Los Angeles.

Mr. Prushinowski's allocution was an extended one. It consisted of an initial statement by petitioner, responses by petitioner to some questions by the court, and finally the adoption by petitioner of the prosecutor's explication of his criminal activities.

Initially Mr. Prushinowski attempted to explain his mail fraud scheme:

I open an account at Manufacturers Hanover for DJY Trading Company, which was my company. I had a deposit made into the account of checks drawn on banks outside New York and Israel when I knew that there was not money to cover these checks. I was told the deposit would be made in this time that it took the check to collect by mail but I knew that if the deposits were not made the bank will lose money because I was overdrawn in the bank.

One of these checks was a check in the name of Flohr for the sum of $263,000. Another was a check in the name of D. Denenberg for $1,500,000. The check was deposited to take care of overdraft because of another check.

\*      \*      \*      \*      \*      \*

I start again. Another check was in the name of D. Denenberg for $1,500,000. The check was deposit to take care of overdraft of other checks which were returned. I had caused to be deposit these checks that were returned unpaid plus money I owe on a line of credit for the bank, the $300,000 we mentioned before.[1]

\*      \*      \*      \*      \*      \*

[Questions by the court]

Q. The check of Mr. Flohr that was made by or that showed a maker of Y. Flohr for $263,000, you knew that check was worthless, did you not?

A. If I knew that? Yes, I knew. When I drew the check, I knew the check was no good.

Q. And you knew the check of $1,500,-000 showing the maker D. Denenberg was no good?

A. I knew, yes.

Q. And these were deposited in the Manufacturers in Manhattan?

A. Yes.

(Transcript July 17, 1981, guilty plea, pp. 14–15).

I then, in the presence of Mr. Prushinowski, asked the prosecutor to outline the government's proof with respect to the mail fraud count, advising Mr. Prushinowski that he would thereafter be asked "if this is a correct statement of what you were involved with." The prosecutor made the following statement which, it developed, en-

---

1. Here Mr. Prushinowski referred, not to any prior statement by himself, but to my earlier summary of the charges to which he pled guilty.

compassed not only the mail fraud count but also the two false statement counts:

"Your Honor, perhaps by way of introduction, the indictment describes these items as checks. We have copies of some of them here. Mr. Mukasey has them in his possession. In actuality, it would assist the court in understanding the basis of the crime and the crime committed to appreciate these were counter checks and essentially they were made on blank forms, not the kind of form preprinted and submitted by a bank to its customer.

In essence, Manufacturers Hanover Trust Company treated them as drafts, and when Mr. Prusinowski [sic] would come in or cause someone else to come into the bank and present this draft drawn on a bank outside New York or outside the United States, the bank would treat it as a draft and purchase it at a discount, making an immediate credit to Mr. Prushinowski's account, allowing him to draw the funds immediately, and send the check or the draft, along with other correspondence normally used in the banking process, either to the bank outside New York or outside the United States on which the draft was drawn, or, if that bank was unknown to Manufacturers Hanover Trust Company or they did not have a corresponding relationship with each other, would send the check and the accompanying documents to a correspondent bank of Manufacturers Hanover Trust Company in the state or country in which the drawee bank was located.

So essential [sic] the theory of Count 1 is in order to induce Manufacturers Hanover Trust Company to make immediate credit, in other words, to purchase the drafts at a discount Mr. Prushinowski deposited or sold, whichever language you care to use, these drafts to the bank, and in the normal course of processing of these items by the bank, the drafts and accompanying documents were sent via the United States mail from New York, New York, to the appropriate places outside New York for collection.

Though he received the immediate crediting of cash to his account, the government's theory is that it was essential to the success of his scheme, since he intended to do this on a continuing basis, that there be a long delay between the purchase of the drafts by the bank or the purchase of the checks, if you care to describe it that way, and its return to the bank, informing the bank, essentially, that these items were worthless and no good.

Mr. Prushinowski was trading, under the government's theory, on the long delay incident to the use of the mails, particularly between the United States and Israel, that it would take at least several weeks for the bank to learn that the items were no good and in the interim he would draw down the proceeds from his account that the bank had placed there as a result of their purchase.

Specifically with respect to the check which is the subject of Count 18, we would prove at trial that the bank purchased that check or that draft with the face amount of $263,000 for the sum of slightly less than that, about $262,000 and change, on that same day. The check was purchased on November 13. On November 14, Manufacturers Hanover forwarded certain documents, including the draft, to their correspondent bank in Jerusalem. The bank was Hapolim. It was not until much later, in late December, that the bank learned that that draft, among others, was being dishonored.

On November 14, the day after Mr. Prushinowski presented this draft representing that it was good to the bank, among other things he presented for certification by Manufacturers Hanover Trust Company a check in the amount of $200,940.43 made payable to Eastman Kodak, presumably in payment of an invoice from Eastman Kodak to his company. Without the prior discount of the draft I described and one other that was done at the same time by Mr. Prushinowski, there would not have been anything resembling sufficient funds in his account to warrant the certification of the check to Eastman Kodak.

Were there a trial, the government would, in each of the instances listed in the

counts other than the mail fraud count as well as some others, provide the same kind of proof, and therefore it would be our theory with respect to Count 18, your Honor, that in effect the presentation of this draft was a request to Manufacturers Hanover to purchase the draft and Mr. Prushinowski represented the draft was good and the funds existed to pay the draft, and, as he stated in his allocution, he knew that not to be the fact at the time he presented the draft to the bank.

With respect to Count 23, the situation is a tiny bit different, as I understand it.

That particular check for $1.5 million was never actually deposited or purchased by Manufacturers Hanover Trust Company. What occurred was some time in mid-December of 1975, Mr. Candido, who I think was the assistant branch manager at Manufacturers Hanover Trust Company where Mr. Prushinowski maintained his account and with whom Mr. Prushinowski had had prior dealings and who was the officer essentially who approved both the unsecured demand loan to Mr. Prushinowski's company as well as the purchase of the prior drafts, notified Mr. Prushinowski that there was a substantial problem with his account, that all of the drafts which had been previously purchased had come back to his [sic] dishonored. He requested Mr. Prushinowski to resolve the matter.

In an effort to resolve the matter and to induce Mr. Candido, and therefore Manufacturers Hanover Trust Company, to continue to maintain the account relationship and to permit Mr. Prushinowski, if the bank did so, to continue his scheme, it would be our theory, he offered this $1.5 million draft with the maker D. Denenberg, drawn on the Chase Manhattan Bank in Los Angeles as a lulling, again representing this is a good draft, this will clear up my overdraft situation.

As your Honor might not be surprised to hear, by then the banker was having no more of this and he was already sufficiently embarrassed, and subsequently the bank discharged him. He did not put that draft through for collection, but nevertheless it would be our theory that it was a statement and a representation by Mr. Prushinowski to induce the bank to take certain action with respect to his account relationship. In effect, Mr. Prushinowski wished the bank to purchase that draft. The fact they would not do so was no different than the other application of Section 1014 of Title 18. If someone makes a false statement on a loan application and the bank doesn't make the loan, nevertheless the applicant wishes the bank to make the loan."

(Transcript, July 17, 1981, guilty plea, pp. 16–21).

Mr. Prushinowski acknowledged that the foregoing was a correct statement of the scheme.

### III.

The primary basis for petitioner's application to vacate his sentence is the Supreme Court's decision in *Williams v. U.S.*, —— U.S. ——, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982). He contends that application of *Williams* must effect the invalidation of his conviction on the false statement counts. Thus he urges that his sale of worthless drafts to the bank can no longer be considered the making of "false statements" because it was held in *Williams* that a check is not a factual assertion and therefore cannot be a false statement. He also claims that the drafts he sold to the bank cannot be considered overvalued "property or security" under § 1014 because the *Williams* Court held that the value of a check is its face amount, notwithstanding the lack of funds to cover it.

Prushinowski urges that the *Williams* holding also requires the vacation of his mail fraud plea. He argues that since, under *Williams,* a check is not a statement, the simple mailing of his worthless drafts would not amount to the transportation through the U.S. mails of "fraudulent" or "false statements."

For the reasons set forth in Part IV of this memorandum, Mr. Prushinowski's application, predicated upon the *Williams* case, to vacate his sentence is denied. His

application to vacate predicated upon the conditions of confinement is also denied, for reasons set forth in Part V.

## IV.

*False Statements to a Bank—18 U.S.C. § 1014*

Section 1014 provides, in pertinent part:

Whoever knowingly makes any false statement or report, or willfully overvalues any land, property or security, for the purpose of influencing in any way the action of . . . any bank the deposits of which are insured by the Federal Deposit Insurance Corporation, . . . upon any . . . advance, discount, purchase, . . . or loan, . . . shall be fined not more than $5,000 or imprisoned not more than two years, or both.

■ As carefully explained in *Williams,* check kiting is a particularized scheme. It involves the transfer by check, between checking accounts in different banks controlled by the same person, of non-existent funds. The check kiter is normally both the drawer—the person obligated on the check—and the payee—the intended recipient of the proceeds. By taking advantage of the time period required to process checks between banks the check kiter can "cover" a check drawn on one bank and deposited in a second bank by depositing in the first bank, prior to payment, a check drawn on the second (or a third) bank.

The Supreme Court held in *Williams* that check-kiting, where the drawer of checks on one bank deposits them in his account in a second bank and then draws money from the account in the second bank, does not constitute the crime proscribed by 18 U.S.C. § 1014 even if, to the drawer's knowledge, the first bank will inevitably dishonor the checks because there are not sufficient funds on deposit there. Thus the check-kiter in *Williams* did not, by depositing a "bad check", thereby make a "false statement", because "a check is not a factual assertion at all, and therefore cannot be characterized as 'true' or 'false'." *Id.* 102 S.Ct. at 3092. Nor did the check-kiter overvalue property or security. "Even assuming that petitioner's checks were property or security as defined by § 1014, the value legally placed upon them was the value of petitioner's obligation; as defined by Louisiana law, that is the only meaning actually attributable to a bank check. [Statute citation omitted] In a literal sense, then, the face amount of the checks were their values." *Id.* The Supreme Court seems to have relied on the existence of an obligation on the part of the drawer-depositor of the checks, stemming from § 3–413(2) of the Uniform Commercial Code, "to make good the obligations if the [bank] dishonored the drafts." *Id.* The majority was pointedly concerned about trivializing § 1014 and noted that each count of the *Williams* indictment charged that Williams had bounced a single check drawn on his own account. There was no allegation that the check kiter "had engaged in an extended scheme to obtain credit fraudulently." *Id.* 102 S.Ct. at 3093.[2]

**2.** The *Williams* decision was the basis for a December 10, 1982 Second Circuit vacation, with the consent of the government, of a § 1014 "check kiting scheme" conviction while upholding the rest of a multicount conviction in *U.S. v. Slocum,* 695 F.2d 650 (2d Cir.1982). The Court of Appeals noted in *Slocum* that the "debate has not been settled" on what violates § 1014. *Id.* at 654. The Supreme Court noted the lack of any allegation of a "scheme" in *Williams. See supra,* pp. 156–157, 159–160.

In *U.S. v. Krown,* 675 F.2d 46 (1982), a case cited in *Williams,* the Second Circuit held that the deposit of a certified check can constitute a false statement under § 1014, *id.* at 50: because no connection was shown between the

deposit and any advance or loan, no violation of § 1014 was found (*id.* at 51).

The only case found applying the *Williams* decision in other than a check-kiting situation is *U.S. v. Elliot,* 689 F.2d 178 (10th Cir.1982). There the court held that the presentment of one third party check payable to a bank, drawn on a Swiss bank, was not a "false statement," under 15 U.S.C. § 645(a) (similar in language to 18 U.S.C. § 1014), citing *Williams.* Although *Elliot* apparently did not entail the type of continuous fraud alleged and admitted herein, and thus is factually distinguishable, the Tenth Circuit did no more than quote *Williams* without analysis, and the case is thus of little aid in the proper application of *Williams.* In *Williams* the Supreme Court expressed concern

The mail fraud count of the *Prushinowski* indictment sets forth a complete scheme on Mr. Prushinowski's part to defraud Manufacturers. By pleading guilty to that count he admitted the scheme. The paragraphs of the mail fraud count which set forth the scheme to defraud were, moreover, incorporated by reference in the false statement counts to which Mr. Prushinowski pled guilty, Counts 18 and 23. (*See* pp. 152–153, *supra.*

Thus prior to submitting to Manufacturers the checks involved in Counts 18 and 23, Mr. Prushinowski had submitted to Manufacturers fictitious financial statements with respect to two companies, DJY Trading Company and BMH Trading Corporation (*see* p. 152, *supra*), for the purpose of obtaining a line of credit from Manufacturers. Thereafter, Manufacturers made a $300,000 demand loan to Mr. Prushinowski and DJY Trading Company to which Mr. Prushinowski adverted in his allocution (*see* pp. 153–154, *supra*). Mr. Prushinowski, or others on his instruction, then created particular drafts from blank forms (counter checks), signing illegible, fictitious or unauthorized names as makers or drawers, drawing on non-existent accounts or insufficiently funded accounts, and identifying one of Mr. Prushinowski's companies as payee. In essence, with respect to each of these drafts, Mr. Prushinowski created, or caused to be created, a document (with a fictitious maker or drawer) purporting to be intended to discharge what was in fact a fictitious indebtedness by the "maker" to Mr. Prushinowski's company. These fictitious drafts were sold at discount to Manufacturers, a federally insured bank, and the proceeds of these discounted sales were then credited to the account of Mr. Prushinowski's company.

By the device of the false financial statements filed with Manufacturers, Mr. Prushinowski had established with Manufacturers an entree for himself and his company which made it possible for him to sell to Manufacturers, for discounting, drafts which purported on their face to have value but which were in fact worthless. The very presentation by Mr. Prushinowski of these drafts for discounting constituted a representation on his part that they were received by Mr. Prushinowski or his company in the course of business activities, and that they had the value which was reflected on their face.[3] It was open to the government on the trial of the action, if Mr. Prushinowski had not pled guilty, to establish through testimony of bank officers the oral amplifications of these representations which Mr. Prushinowski indulged.

Mr. Prushinowski's fraud was not, therefore, check kiting. A check kiter as drawer of a check engages upon dishonor, under U.C.C. § 3–413(2), to pay the amount of the check. Thus under *Williams* the check's value is its face amount; even if the bank upon which it is drawn dishonors it, it represents a commitment by the drawer to pay the face amount. The illegible, or fictitious, or unauthorized "makers" or "drawers" of petitioner's drafts did not so engage. They probably did not even exist. No obligation ran to Manufacturers; no obligation

---

[3] that "any check, knowingly supported by insufficient funds, ... could give rise to criminal liability, whether or not the drawer had an intent to defraud." 102 S.Ct. at 3093. Thus it demurred at the federal criminalization of the act of drawing an uncovered check against one's own account, when the drawer can assert an intent timely to cover the check. The Supreme Court did not extend its concern to third parties who, as part of schemes to defraud in connection with loans or other credit activities, forged documents or created fictitious signators as makers or drawers of checks, sometimes drawn on nonexistent accounts.

**3.** The draft for $1.5 million which is the subject of Count 23 was submitted to Manufacturers but not acted upon by Manufacturers. (*See, supra,* pp. 153–154, 154–155). It did constitute a representation to the bank, however, that there was an indebtedness running from D. Denenberg to DJY Trading Co. in the sum of $1,500,000, and that the draft presented to the bank for discount was intended to discharge that indebtedness and hence had a value of $1,500,000. And this representation was made for the purpose of inducing Manufacturers to advance further sums to Mr. Prushinowski or DJY Trading Company (or to accept the draft in discharge of amounts previously advanced).

ran even to Mr. Prushinowski. Consequently petitioner's scheme was not the "unremarkable conduct" *Williams* held was not a federal felony. *Id.* 102 S.Ct. at 3093. Each of Mr. Prushinowski's drafts was completely false, and each constituted a part of his scheme to defraud Manufacturers. While Mr. Prushinowski's sale of these drafts to Manufacturers at a price close to the "value" shown on their face (*see* pp. 152–153, 153–155, *supra*) constituted a representation of value, the only obligations these drafts bespoke were fictitious obligations, and they had no value. *Williams* is inapplicable.[4]

*Mail Fraud—18 U.S.C. § 1341*

Section 1341 of Title 18 provides, in relevant part:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

In *Williams, supra,* Justice Marshall (dissenting) noted that various circuits "have been virtually unanimous in holding that check-kiting is subject to federal prosecution under mail and wire fraud statutes." *Id.* 102 S.Ct. at 3102 (citations omitted). *See United States v. Braunig,* 553 F.2d 777, 781–82 (2d Cir.), *cert. denied,* 431 U.S. 959, 97 S.Ct. 2686, 53 L.Ed.2d 277 (1977); *United States v. Constant,* 501 F.2d 1284 (5th Cir. 1974), *cert. denied,* 420 U.S. 910, 95 S.Ct. 830, 42 L.Ed.2d 840 (1975); *Falconi v. Federal Deposit Insurance Corp.,* 257 F.2d 287, 291 (3d Cir.1958).

Petitioner argues that under *Williams,* the worthless drafts he sold to the bank were not "false statements", and that therefore their mailing for collection purposes would not be mail fraud.

It is not necessary, however, actually to transport a false statement through the mail for conviction under § 1341. The mail fraud statute requires only that defendant knowingly participate in a fraudulent scheme, and that it be foreseeable that the scheme would involve the use of mails. *United States v. Hasenstab,* 575 F.2d 1035, 1039 (2d Cir.), *cert. denied,* 439 U.S. 827, 99 S.Ct. 100, 58 L.Ed.2d 120 (1978); *United States v. Cyphers,* 556 F.2d 630, 632 (2d Cir.), *cert. denied,* 431 U.S. 972, 97 S.Ct.

---

4. Petitioner's fabricated drafts are analogous to the fraudulent certified check drawn on a fictitious foreign bank found to be a "false statement" under § 1014 in *U.S. v. Krown,* 675 F.2d 46, 50 (2d Cir.1982). Since in *Krown* the fraudulent check was not used to influence a bank in connection with an advance, loan, application or commitment (it was deposited by the payee and not drawn upon), the Court held that one of the elements of a § 1014 violation had not been established. *Id.* at 51.

Mr. Prushinowski's activities were akin to various pre-*Williams* situations held violative of § 1014: worthless invoices submitted to a bank in satisfaction of a purchase agreement, *United States v. Cerrito,* 612 F.2d 588 (1st Cir. 1979); false credit card sales invoices deposited and the credit generated withdrawn by check, *United States v. Helgesen,* 513 F.Supp. 209 (E.D.N.Y.1981), *aff'd and remanded on other grounds,* 669 F.2d 69 (2d Cir.), *cert. denied,* 456

U.S. 929, 102 S.Ct. 1978, 72 L.Ed.2d 445 (1982); false invoices presented to a bank to obtain release of loan monies previously committed, *United States v. Norberg,* 612 F.2d 1 (1st Cir. 1979); and false credit card sales invoices deposited into bank account, *United States v. Maalouf,* 514 F.Supp. 851 (E.D.N.Y.1981).

In *Cerrito,* the First Circuit upheld a § 1014 conviction for submission of worthless invoices to a bank in satisfaction of a purchase agreement. Under the agreement, the bank would credit the defendant's account with 90% of the invoice's face value. Once the account was credited, the bank was unable to collect the receivables because the invoices were false. Just as the false invoices constituted "false statements" to the bank in *Cerrito,* the discounted and purchased worthless drafts generated by Mr. Prushinowski constituted false statements in the instant case.

2937, 53 L.Ed.2d 1070 (1977), quoting *United States v. Finkelstein,* 526 F.2d 517, 526–27 (2d Cir.1975), *cert. denied; Scardino v. United States,* 425 U.S. 960, 96 S.Ct. 1742, 48 L.Ed.2d 205 (1976).

Mr. Prushinowski has admitted to a scheme to defraud Manufacturers. He has also admitted that an essential and anticipated step in that scheme was the mailing by the bank of his fabricated drafts for collection to out-of-state and foreign banks. The non-local nature of the purported makers or drawers of the fabricated drafts made it impossible for the bank to discover the fictitious nature of the values reflected by the drafts prior to crediting petitioner's account. The mailing and collection delay allowed Mr. Prushinowski time to use the funds which, upon purchase and discount, the bank credited to his account. Thus use of the mails was, and was intended to be, an essential element of his scheme.[5] *Williams* is inapplicable.

I have made it clear above that in my judgment *Williams* does not require modification of the judgment of conviction on the § 1014 counts (*supra* pp. 156–157). However, even if I had determined that the *Williams* case required the setting aside of the judgment of conviction on the § 1014 counts, there is nothing before me on this § 2255 application which would justify a setting aside of the conviction on the § 1341 count, or a modification of the sentence on that count.

The fraudulent scheme set forth in Count 1 was a serious one; the crime was a carefully crafted and deliberate one. The sentence of three years with respect to Count 1 was only imposed after I gave full and careful consideration to the scope and nature of the crime and all of the information with respect to Mr. Prushinowski which came to my attention through his plea, through the pre-sentence report, through the pre-sentence conference, and through presentations by the government and defense (including the allocution of Mr.

Prushinowski) at the time of sentence. The same sentence would have been imposed with respect to Count 1 whether or not Counts 18 and 23 had been charged.

The activities which prompted the charges contained in Counts 18 and 23 constituted a part of Mr. Prushinowski's total scheme to defraud; in that context I certainly considered those activities in determining the sentence which I imposed with respect to Count 1. I see nothing in *Williams* which suggests that they should not have been considered. To the contrary, and as I have already noted (*supra,* pp. 156–157), the *Williams* Court seems rather to have been troubled by the vagabond nature of the check-kiting charges against *Williams,* and their apparent lack of relation to any allegations of a fraudulent scheme:

> Under the Court of Appeals' approach, the violation of § 1014 is not the *scheme* to pass a number of bad checks; it is the presentation of one false statement—that is, one check that at the moment of deposit is not supported by sufficient funds—to a federally-insured bank. The United States acknowledged as much at oral argument. ... Indeed, each individual count of the indictment in this case stated only that petitioner knowingly had deposited a single check that was supported by insufficient funds, not that he had engaged in an extended scheme to obtain credit fraudulently. (citations omitted; emphasis in original).

*Id.* 102 S.Ct. at 3093.

In sum, while I did consider all the facts brought to my attention with respect to Mr. Prushinowski's fraudulent scheme in imposing sentence on Count 1, the dimensions of that sentence were neither augmented nor diminished by the happenstance that Mr. Prushinowski was also indicted on other charges drawing on some of those same facts, and the further happenstance that he pleaded guilty to two of those charges.

Thus were I to have decided that Mr. Prushinowski's conviction on Counts 18 and

---

5. For a scheme to be violative of § 1341, "it is not necessary that the scheme contemplate the use of the mails as an essential element"; it is necessary only that the mailing be "incident to an essential part of the scheme." *Peirira v. U.S.,* 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954).

23 should be set aside, it would not affect the sentence I imposed with respect to the mail fraud count.[6]

## V.

*Conditions of Confinement*

██ Mr. Prushinowski claims that the failure by the Bureau of Prisons to provide appropriate kosher food in the federal correctional facilities in Danbury, Connecticut, and in Butner, North Carolina, violates his First and Eighth Amendment rights, and he seeks relief as a part of his 28 U.S.C. § 2255 motion.

In *United States v. Hayman,* 342 U.S. 205, 72 S.Ct. 263, 96 L.Ed. 232 (1952), the Supreme Court pointed out that § 2255, which was enacted in 1948, and was designed, with respect to collateral attack, to create jurisdiction in the sentencing court, did not transfer to the sentencing court all habeas corpus jurisdiction.

The Second Circuit has held that a district court lacks jurisdiction under § 2255 to hear a prisoner's attack on a federal prison's failure to provide adequate kosher food in prison if the prison is not within the district. *United States v. Huss,* 520 F.2d 598 (2d Cir.1975). In *Huss* the court ruled that § 2255 was intended to provide a statutory process for collateral attack on judgments of sentence following conviction and was not intended to provide jurisdiction in the sentencing court with respect to conditions of confinement:

[I]f we were to construe the 1948 revision as transferring to the sentencing court

not only collateral attack litigation, but also litigation over conditions of confinement, we would be creating . . . administrative difficulties which § 2255 was designed to avoid.

*Id.* at 603. The court held that 28 U.S.C. § 2241, the habeas corpus provision, is available for challenges to conditions of custody allegedly "in violation of the Constitution or laws . . . of the United States . . . ." 28 U.S.C. § 2241(c)(3).

I lack jurisdiction under 28 U.S.C. § 2255 to consider Mr. Prushinowski's "conditions of confinement" claim.[7]

SO ORDERED.

---

**6.** By the same token, if an appellate court were to decide that I am in error in upholding the validity of Mr. Prushinowski's conviction on Counts 18 and 23, and reverse as to those counts, it should not affect the sentence I imposed with respect to Count 1.

**7.** Mr. Prushinowski filed a suit under 28 U.S.C. § 2241 in the District of Connecticut (*Prushinowski v. Gunnell,* Civ. B–82–176) where he raised the same issues presented here regarding the conditions of confinement. I understand that that action was transferred to the district court in North Carolina in November of 1982, since Mr. Prushinowski is now confined in that state. Thus petitioner is attempting to litigate the same issue in two forums.

In *Kahane v. Carlson,* 527 F.2d 492 (1975), the Second Circuit upheld jurisdiction in the District Court for the Eastern District of New York under 28 U.S.C. § 1361, the mandamus statute, to hear a federal prisoner's request for provision of kosher food by prison authorities (in effect challenging a nationwide policy of the Bureau of Prisons); the plaintiff was a prisoner whose legal residence prior to incarceration was in the Eastern District of New York. The mandamus statute is not argued in the instant case. Further, if it were presented, query whether there would be proper venue in this court under 28 U.S.C. § 1391(e). I would deem it appropriate, in any event, to exercise my discretion under 28 U.S.C. § 1404(a) and transfer the case to the district court of the district in which Mr. Prushinowski is confined.