934 F.2d 1528
 UNITED STATES of America, Plaintiff-Appellee,
v.
Robert S. FALCONE, Sandra S. Falcone, Defendants-Appellants.
 No. 89-5718.
 United States Court of Appeals,
Eleventh Circuit.
 July 11, 1991.
 
 G.H. Terando, Poplar Bluff, Mo., for R. Falcone.
 Kenneth M. Swartz, Asst. Federal Public Defender, Miami, Fla., for S. Falcone.
 Dawn Bowen, Linda C. Hertz, Asst. U.S. Attys., Miami, Fla. for U.S.
 Appeal from the United States District Court for the Southern District of Florida.
 Before POWELL*, Associate Justice, TJOFLAT, Chief Judge, and KRAVITCH, Circuit Judge.
 PER CURIAM:
 
 
 1
 Robert S. and Sandra S. Falcone were convicted on one count of conspiring to commit an offense against the United States, under 18 U.S.C. Sec. 371 (1988), by violating 18 U.S.C. Secs. 1344(a)(2) and 2113 (1988), and on several counts of violating 18 U.S.C. Secs. 1344(a)(2) and 2113. On appeal, the Falcones contend, inter alia, that because they did not direct their conspiracy at the United States or one of its agencies, it was not a conspiracy to commit an offense against the United States under 18 U.S.C. Sec. 371. Given this circuit's interpretation of Tanner v. United States, 483 U.S. 107, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987), in United States v. Hope, 861 F.2d 1574 (11th Cir.1988) (Hope I ), and United States v. Hope, 901 F.2d 1013 (11th Cir.1990) (per curiam), application for stay of mandate and cert. denied, --- U.S. ----, 111 S.Ct. 713, 112 L.Ed.2d 702 (1991) (Hope II ), we agree. Accordingly, we reverse the Falcones' convictions under 18 U.S.C. Sec. 371; we affirm, however, their convictions under 18 U.S.C. Secs. 1344(a)(2) and 2113.
 
 I.
 
 2
 Beginning in 1983, Robert and Sandra Falcone owned and operated a retail insurance agency, the Insurance Connection, in Hollywood, Florida. The Insurance Connection sold high-risk automobile insurance directly to the public. In 1984, the Falcones decided to enter the wholesale insurance business by opening a general insurance agency that would deal with retail insurance agents rather than the public. A general agency, however, cannot sell policies unless an insurance company agrees to underwrite them; in essence, a general agency acts as a regional branch office for an insurance company.
 
 
 3
 As the first step towards opening a general agency, the Falcones formed a Florida corporation, Ocean General Agency, Inc. (OGA), in mid-1984, and began to search for an insurance company that would contract with OGA to underwrite high-risk automobile insurance policies. They asked a family friend and business associate, Med James, who was already involved in the wholesale insurance business, to help them find an underwriter. In response, James contacted Thomas O'Connell, with whom he had done business in the past; O'Connell, with Robert Walker, owned an insurance company based in Texas, American Excel Insurance Co. (American Excel), which specialized in high-risk auto insurance.
 
 
 4
 By early 1985, the Falcones had agreed with O'Connell and Walker that American Excel would give OGA a contract to issue American Excel's policies. OGA issued stock, in equal shares, to Sandra Falcone, James, O'Connell, and Walker. The shareholders agreed that OGA would be a subchapter S corporation.[1] OGA's articles of incorporation stated that its shareholders, rather than a board of directors, would manage OGA.[2] Minutes entered in the corporate record book that purport to memorialize an organizational meeting of the shareholders on January 15, 1985, however, describe the election of a five-member board of directors: the four shareholders plus Wayne Dent, an American Excel employee.
 
 
 5
 OGA's shareholder/directors, according to these minutes, also appointed officers to manage OGA's day-to-day business: Edwin Rillo, a business associate of the Falcones who was also involved in the retail insurance business in south Florida, was, initially, OGA's president and treasurer, Wellington "Duke" Peay, an insurance broker, was vice president, and Sandra Falcone was secretary. Robert Falcone owned no OGA stock and held no formal position with the company, but some testimony at trial indicated that he had an undefined management role in which he oversaw OGA's operations, supervised its bank deposits, and engaged in long-range planning.
 
 
 6
 According to the minutes dated January 15, the board adopted a corporate resolution authorizing OGA to open bank accounts at the Orange State Bank (Orange State) and stating that two signatures, Robert Falcone's and either Ed Rillo's or Duke Peay's, would be required for OGA banking transactions on that account.[3] The witnesses at trial agreed that the January 15 minutes are inaccurate in some respects; the witnesses presented conflicting testimony on how many organizational meetings occurred, who attended them, what took place, and when OGA issued its stock.[4]
 
 
 7
 In early and mid-1985, OGA opened several bank accounts at Orange State. When OGA opened the accounts, it filed at the bank corporate resolutions providing that two signatures were required for all transactions: Robert Falcone's and either Ed Rillo's or Duke Peay's. Bank statements were to be mailed to OGA's office. Rillo resigned from OGA in May 1985, and Peay was appointed president of the company;[5] later resolutions filed at Orange State listed the two required signors as Robert Falcone and Duke Peay, but the original resolution in the corporate minute book was never altered.
 
 
 8
 After James and O'Connell became uneasy, in mid-1985, about whether OGA should keep all of its funds at Orange State, OGA opened other accounts and purchased certificates of deposit at Commerce Bank, North Carolina National Bank (NCNB), and Barnett Bank. For each of these accounts, it filed corporate resolutions at these banks requiring two signatures for all transactions; it also requested that statements be mailed to OGA's office. Peay (who was president of OGA by that time) testified that he was aware of each of these accounts, but no formal corporate resolution, adopted by the board or the shareholders and then entered in the corporate minute book, authorized them.
 
 
 9
 OGA deposited a large amount of money in its accounts at Orange State and elsewhere. OGA held most of these funds as a fiduciary for either American Excel (to pay American Excel for the policies OGA had issued) or individual policy holders (to reimburse them for overpaid premiums). Approximately 12.5% of these funds,[6] however, were OGA's commission for the policies it had sold; this amount, less the overhead and expenses of the company,[7] was profit.[8]
 
 
 10
 In mid-1985, the Falcones began the activities that led to criminal charges against them. On August 7, 1985, they opened an OGA account at Commerce Bank without informing Peay. They filed a corporate resolution with this account that stated that Robert Falcone was the owner and chairman of the board of OGA and that only one signature, either Robert Falcone's, Sandra Falcone's, or Duke Peay's, was needed for transactions on the account.[9] The resolution directed the bank to send statements for the account to OGA; it listed, however, the Insurance Connection's address. O'Connell and James both testified that they never, as shareholders or board members, approved the use of one signature for OGA's banking transactions.
 
 
 11
 The Falcones made two $50,000 deposits to this account. First, they deposited a check drawn on one of OGA's accounts at Orange State, signed by Robert Falcone and stamped with the facsimile signature of Duke Peay. Peay testified that he did not authorize the use of his signature stamp for this check.[10] Second, after a $50,000 certificate of deposit that OGA had purchased at Commerce Bank matured, the Falcones asked bank officials to deposit the proceeds in the new account. On August 8, Robert Falcone withdrew $8,500 from this account, using a withdrawal slip bearing only his signature.
 
 
 12
 On August 15, 1985, the Falcones opened an account at Orange State in the name of Payco Premium Finance Company, Inc. (Payco), an inactive corporation they owned. Transactions on this account required only one signature, either Robert's or Sandra's.
 
 
 13
 By this time, O'Connell and Walker had grown dissatisfied with OGA and told James that they wanted to end their involvement with the company. James agreed to consider purchasing O'Connell's and Walker's interests in OGA; he testified that he discussed this with the Falcones. On September 18, 1985, American Excel notified OGA that it was terminating the underwriting contract; after the contract was cancelled, OGA would not be able to issue American Excel's policies. Peay and the Falcones responded that American Excel had not complied with the contract, which required that American Excel notify OGA ninety days before it cancelled. American Excel then notified OGA that it was terminating the contract effective December 31, 1985.
 
 
 14
 On September 19, 1985, the Falcones opened another OGA account at Barnett Bank; they filed a corporate resolution at the bank stating that Robert Falcone was the owner and director of OGA and that only one signature, either Robert's or Sandra's, was required for transactions on the account.[11] They directed the bank to hold statements for the account, rather than mailing them.[12] Peay testified that he was unaware of this account.
 
 
 15
 By October 9, 1985, the Falcones had made eight deposits of OGA's money, for a total of $750,000, to this Barnett Bank account. Seven of these deposits were checks drawn on OGA's Orange State accounts. Four of the seven Orange State checks were signed by Robert Falcone and bore a facsimile stamp of Duke Peay's signature; Peay testified that he had not authorized these uses of the stamp. Robert Falcone and Peay both signed three of the Orange State checks. Peay testified, however, that he did not know that Robert Falcone intended to deposit the checks in the Barnett Bank account. Instead, he signed the checks with the understanding that one would be used to purchase a certificate of deposit at Barnett Bank and one would be deposited in OGA's account at NCNB; he did not recall why he signed the third check. For the last deposit to the Barnett Bank account, Robert Falcone withdrew $50,000 from the Commerce Bank account that he and Sandra had opened on August 7, with a withdrawal slip bearing only his signature (as permitted by the corporate resolution he and Sandra had filed when they opened the account, see supra p. 1531); he then purchased a Commerce Bank cashier's check payable to OGA with this money and deposited it in the Barnett Bank account.
 
 
 16
 On October 10, Robert Falcone wrote a check, signed only by him, for $250,000 on this Barnett account. He deposited this check in an account at Orange State under the name of Capital Management Corporation, another corporation he owned.[13] On the same day, Falcone withdrew $250,000 from the Capital Management account and deposited it in the Payco account he and his wife had created on August 15, see supra p. 1532.
 
 
 17
 On October 21, Robert Falcone "fired" Peay as president of OGA.[14] On the next day, the Falcones visited NCNB and informed a bank official that Peay was no longer with OGA; they presented a new signature card and corporate resolution indicating that transactions on the NCNB account could be conducted only by Robert Falcone. The bank official became suspicious and froze OGA's accounts.
 
 
 18
 Also on October 22, Robert Falcone wrote a check on the Payco account (in which he had deposited $250,000 of OGA's money from the Barnett account) for $117,915 to the Chase Federal Bank to satisfy the remainder of the mortgage on the Falcones' home.
 
 
 19
 On October 24, Peay and the other shareholders of OGA obtained an ex parte court order prohibiting the Falcones from interfering in OGA's business and forbidding local banks from accepting new corporate resolutions or checks with facsimile signatures. Peay testified that, at this time, about $500,000 remained in the Barnett Bank account and about $50,000 remained in the Commerce Bank account.
 
 
 20
 On November 6, Robert Falcone wrote a $70,000 check on the Payco account to the Falcones' teenage son, Joseph. On November 7, a Florida court appointed Peay receiver for OGA and ordered the Falcones to return any assets of OGA in their possession; in response, they returned ten certificates of deposit, valued at $1,000,000, the signature stamp, and OGA's checkbook.[15]
 
 
 21
 On June 1, 1988, a federal grand jury indicted the Falcones on thirteen counts of violating federal law. Count I charged them, pursuant to 18 U.S.C. Sec. 371,[16] with conspiring to commit an offense against the United States by violating 18 U.S.C. Secs. 1014, 1344(a)(2), and 2113 (1988). Counts II, III, and IV charged them with violating 18 U.S.C. Secs. 2[17] and 1014[18] (1988), by making false statements to federally insured banks. Counts V, VI, VII, and VIII charged them with violating 18 U.S.C. Secs. 2 and 1344(a)(2),[19] by obtaining money in the custody or control of a federally insured bank by means of false or fraudulent representations when they withdrew money from Orange State by presenting four checks stamped, without authorization, with the facsimile signature of Duke Peay. Count IX charged them with violating 18 U.S.C. Secs. 2 and 1344(a)(2), by opening an OGA account at Barnett Bank with a false corporate resolution and then depositing and withdrawing OGA's funds from that account. Counts X and XI charged them with violating 18 U.S.C. Secs. 2 and 2113(b),[20] by taking money in the custody or control of a federally insured bank with the intent to steal it, when they withdrew OGA money from the Payco account at Orange State, paid the mortgage on their home, and gave $70,000 to their son. Finally, counts XII and XIII charged them with violating 18 U.S.C. Secs. 2 and 2113(a),[21] by entering federally insured banks with the intent to commit felonies affecting such banks, by presenting false corporate resolutions to Barnett Bank and to NCNB in violation of 18 U.S.C. Sec. 1344(a)(2).
 
 
 22
 At trial, the district court granted the Falcones' motions for acquittal on Counts II, III, and IV; those charges were, accordingly, redacted from the indictment. The jury found both defendants guilty on each of the remaining ten counts.
 
 II.
 
 23
 On appeal, the Falcones raise several challenges to their convictions. First, they challenge their 18 U.S.C. Sec. 371 conspiracy convictions; they argue that under Supreme Court and Eleventh Circuit jurisprudence, a conspiracy "to commit any offense against the United States" must be directed at the United States or one of its agencies. They targeted their conspiracy, they assert, only at federally insured banks and at OGA, a private corporation, and thus did not engage in a criminal conspiracy that violated section 371. The Government admits that a federally insured bank is not a federal agency, but argues that section 371 criminalizes conspiracies to violate the laws of the United States even when the United States is not the target of the conspiracy.
 
 
 24
 Second, the Falcones challenge their 18 U.S.C. Sec. 1344(a)(2) convictions for obtaining money from Orange State by means of false or fraudulent representations by using, without authorization, Peay's signature stamp. They argue that the presentation of a check bearing such a stamp is not a false representation. Robert Falcone, moreover, contends that the use of the signature stamp was not a false representation because the corporate structure of OGA was such that Sandra Falcone had the power and authority to use the stamp, for administrative convenience, without the specific approval of either Peay or the other shareholder/directors.
 
 
 25
 Third, the Falcones challenge their 18 U.S.C. Sec. 1344(a)(2) convictions for obtaining money from Barnett Bank by means of false or fraudulent representations by presenting a false corporate resolution to Barnett Bank. They argue that section 1344(a)(2) requires that the false representation be the means by which the funds are obtained; because they presented the false corporate resolution before there was any money in the account, and because they both deposited and withdrew the money, their actions are insufficient to support their convictions. Moreover, they point out, section 1344(a)(2) requires that a false representation be material and, they argue, the false corporate resolution was not. Robert Falcone, in addition, contends that the original corporate resolution requiring two signatures was invalid, and that under the informal corporate structure of OGA, Sandra Falcone, as a minority shareholder, had power and authority unilaterally to enact and file the corporate resolution at Barnett; it was, therefore, not a false representation.[22]
 
 
 26
 Finally, Robert Falcone challenges his 18 U.S.C. Sec. 2113(b) convictions for stealing money in the custody of the Orange State Bank; he argues that whatever money he and Sandra used for personal expenses were OGA's profits and, thus, belonged to them.
 
 III.
 
 27
 Whether the Falcones were properly convicted under 18 U.S.C. Sec. 371, and whether their conduct violated 18 U.S.C. Secs. 1344(a)(2) and 2113(a)-(b), are questions of law subject to de novo review. See United States v. Lawson, 809 F.2d 1514, 1517 (11th Cir.1987). In judging the sufficiency of the evidence adduced at trial, we must determine "whether, viewing the evidence in the light most favorable to the [G]overnment, a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt." United States v. Cole, 755 F.2d 748, 755 (11th Cir.1985). We draw all reasonable inferences in favor of the jury's verdict; moreover, "credibility choices in deciding which version of a story to believe are a matter for the jury." Id.
 
 A.
 
 28
 The Falcones first challenge their 18 U.S.C. Sec. 371 conspiracy convictions (count I).[23] Section 371 provides criminal penalties for two distinct types of conspiracies: conspiracies "to commit any offense against the United States," and conspiracies "to defraud the United States or any agency thereof." United States v. Sans, 731 F.2d 1521, 1533 (11th Cir.1984), cert. denied, 469 U.S. 1111, 105 S.Ct. 791, 83 L.Ed.2d 785 (1985); United States v. Haga, 821 F.2d 1036, 1039 (5th Cir.1987); see also Dennis v. United States, 384 U.S. 855, 862, 86 S.Ct. 1840, 1845, 16 L.Ed.2d 973 (1966). But see United States v. Smith, 891 F.2d 703, 712 (9th Cir.1989). The indictment in this case charged the Falcones only with the first type of conspiracy--to commit an offense against the United States, by conspiring to violate 18 U.S.C. Secs. 1344(a)(2) and 2113. They argue that the Supreme Court's decision in Tanner v. United States, 483 U.S. 107, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987), as interpreted by our decisions in United States v. Hope, 861 F.2d 1574 (11th Cir.1988) (Hope I ), and United States v. Hope, 901 F.2d 1013 (11th Cir.1990) (per curiam), application for stay of mandate and cert. denied, --- U.S. ----, 111 S.Ct. 713, 112 L.Ed.2d 702 (1991) (Hope II ), requires the Government to show that the United States or one of its agencies was the target of any conspiracy to commit an offense against the United States. The Government, to the contrary, asserts that the United States need not be the target of such a conspiracy so long as the object of the conspiracy was the violation of a federal law. We agree with the Falcones that the Hope cases mandate reversal of their conspiracy convictions.
 
 
 29
 In Tanner, a Florida corporation, Seminole Electric Cooperative, Inc. (Seminole), borrowed funds from the Federal Financing Bank to construct a power plant. The Rural Electrification Administration (REA), a federal agency, guaranteed this loan; as a condition of this guarantee, the REA required Seminole to follow certain procedures when letting contracts and to obtain REA approval on certain contracts. One defendant, William Conover, Seminole's procurement manager, arranged to award a subcontract on the power plant project to the other defendant, Anthony Tanner, a private contractor and a friend of Conover's, without following REA-mandated procedures. Tanner did not perform the subcontract satisfactorily, and Conover misrepresented the progress of the work; Seminole was required to pay extra for completion of the subcontract and eventually discharged Conover for conflict of interest. Tanner, 483 U.S. at 110-12, 107 S.Ct. at 2742-43. The defendants were convicted, under section 371, of conspiracy to defraud the United States; on appeal, they argued that their convictions should be reversed because they conspired to defraud Seminole, a private corporation, not the United States. The government, in response, argued that because the REA gave Seminole financial assistance and supervised the progress of the project, Seminole should be considered to be an agent of the United States for the purposes of the defraud clause of section 371.
 
 
 30
 The Court agreed with the defendants that under section 371, the United States or one of its agencies must be the target of a conspiracy to defraud the United States. It stated: "The conspiracies criminalized by Sec. 371 are defined not only by the nature of the injury intended by the conspiracy, and the method used to effectuate the conspiracy, but also--and most importantly--by the target of the conspiracy." Id. at 130, 107 S.Ct. at 2752. Following the rule that ambiguous criminal statutes be construed leniently, the Court rejected the government's argument--that a conspiracy to defraud a private entity that receives federal financial assistance, is supervised by a federal agency, or "serve[s] as an intermediary performing official functions on behalf of" the United States is a conspiracy to defraud the United States under section 371. Id. The Court concluded that the government's interpretation of the section did not have "even an arguable basis in the plain language of Sec. 371." Id. at 131, 107 S.Ct. at 2753. Moreover, nothing in section 371's "stingy legislative history" favored the government's position, and the rule the government proposed would not lead to "clarity of application" of the statute. Id.
 
 
 31
 The Tanner Court held, nonetheless, that the defendants' convictions could be valid. It reaffirmed cases that broadly defined a conspiracy to defraud the United States as "any conspiracy for the purpose of impairing, obstructing or defeating the lawful function of any department of Government." Id. at 128, 107 S.Ct. at 2751 (quoting Dennis, 384 U.S. at 861, 86 S.Ct. at 1844). It concluded, further, that a defendant may use third parties to effect a conspiracy to defraud the United States, because the language of section 371 "puts no limits based on the method used to defraud the United States." Id. at 129, 107 S.Ct. at 2752. Accordingly, the Court remanded the case for the lower court to determine whether the defendants had conspired to cause Seminole to make false statements to the REA and therefore had defrauded the United States by impairing the lawful function of a federal agency.
 
 
 32
 Tanner held only that the United States must be the target of a section 371 conspiracy to defraud the United States; indeed, as the indictment and convictions in Tanner were only under the defraud clause, any other holding would have been dictum. The Eleventh Circuit, however, in Hope I, 861 F.2d at 1574, expanded Tanner 's rationale, holding that, under section 371, the United States also must be the target of a conspiracy to commit an offense against the United States. The defendant in Hope I, Alga Hope, ran a nonprofit Florida corporation, Economic Development Corporation of Dade County, Inc. (EDCO), that loaned federal funds to minority-owned businesses. EDCO did not request these funds directly from the federal government; instead, the federal government gave Dade County "block grants," and EDCO requested its funds from Dade County. Hope allegedly conspired with a business associate to induce EDCO to loan funds to another corporation that Hope co-owned; he submitted false documents to Dade County with the loan application. Hope was indicted, in a single count, for both a conspiracy to defraud the United States and a conspiracy to commit an offense against the United States (by violating 18 U.S.C. Sec. 1001 (1988), which provides criminal penalties for making false statements in a matter within the jurisdiction of a federal agency).
 
 
 33
 A panel of this court found that, under Tanner, the indictment failed to allege a criminal offense under both the defraud and offense clauses of section 371, because it stated that the targets of the conspiracy were only county officials and agencies, not the United States. Relying on the language from Tanner stating that section 371 conspiracies are "defined ... by the target of the conspiracy," Tanner, 483 U.S. at 130, 107 S.Ct. at 2752, the Hope I court stated that "[t]he holding in Tanner ... applies with equal force to the 'any offense' clause of Sec. 371 as it does to the 'defraud' clause." 861 F.2d at 1578. Accordingly, it dismissed the conspiracy count of the indictment.[24]
 
 
 34
 In Hope II, 901 F.2d at 1013, the government again indicted, and a jury convicted, Alga Hope, this time for conspiring to commit an offense against the United States by violating 18 U.S.C. Sec. 641 (1988), which prohibits stealing federal funds.[25] In Hope II, Hope caused EDCO to approve a loan to a day-care facility and to obtain federal funding (through Dade County) for the loan; rather than disbursing the funds to the day-care facility, however, Hope deposited them into EDCO's bank account and used them to purchase certificates of deposit and to secure a line of credit. He eventually loaned some of these funds, without appropriate documentation, to a corporation owned by a co-conspirator.
 
 
 35
 The Hope II panel, stating that the Hope I court had "[e]mphasiz[ed] that the holding in Tanner applied with equal force to both clauses of section 371," affirmed Hope's conviction under the offense clause; it held that the indictment "avoided the errors identified in Tanner and Hope I"--that is, it sufficiently alleged that the conspiracy targeted an agency of the United States. 901 F.2d at 1018. The Hope II indictment charged that the object of the conspiracy was to steal money from the Department of Housing and Urban Development (HUD): "Hope diverted federal funds from HUD which were intended for loans to minority owned businesses" and "utilized the[se] funds to purchase certificates of deposit [and] arrange lines of credit"; he then "ma[de] an unauthorized loan" of the funds and "shared the proceeds of that unauthorized loan" with a co-conspirator. Id. Hope therefore conspired "to commit the offense proscribed by [18 U.S.C. Sec. ] 641, the embezzlement or theft of federal funds." The indictment, moreover, "specifically identifie[d] the source of those funds as ... federal funds." Id.
 
 
 36
 We have some doubts as to whether Hope I and Hope II correctly interpreted Tanner when they extended its holding that the United States must be a target of a conspiracy under section 371's defraud clause to the offense clause of that statute. See United States v. Gibson, 881 F.2d 318, 321 (6th Cir.1989) (criticizing Hope I ). We note, for instance, that, as the Government has suggested, the Hope courts' interpretations will remove from the offense clause of section 371 a wide range of conspiracies to violate laws of the United States, such as conspiracies to commit mail and wire fraud, that traditionally have been prosecuted under this section. See post, pp. 1550-51 (Tjoflat, C.J., specially concurring). We are bound, however, to follow circuit precedent.
 
 
 37
 We hold, therefore, that the Government in this case did not prove that the target of the Falcones' conspiracy was the United States or one of its agencies. The Falcones directed their conspiracy, primarily, at federally insured banks and, ultimately, at OGA, a private corporation. The Government does not contend that a federally-insured bank may be deemed the United States or an agency thereof for purposes of section 371; indeed, such an argument is most likely precluded by Tanner, which holds that an entity that receives federal funds and is supervised by the federal government is not the United States under section 371's defraud clause, 483 U.S. at 131, 107 S.Ct. at 2753. Because the Government did not prove that the Falcones directed their conspiracy at the United States or an agency thereof, we reverse the Falcones' convictions for violating the offense clause of section 371.
 
 B.
 1.
 
 38
 The Falcones also challenge their 18 U.S.C. Sec. 1344(a)(2) convictions (counts V-VIII) for their presentations of checks bearing, without authorization, facsimile stamps of Peay's signature to Orange State. Section 1344,[26] like the mail and wire fraud statutes on which it is based, 18 U.S.C. Secs. 1341 and 1343 (1988),[27] provides criminal penalties for two distinct types of bank fraud: in subsection (a)(1), it outlaws schemes to defraud federally insured financial institutions, and in subsection (a)(2), it outlaws schemes to obtain funds in the custody or control of federally insured financial institutions by means of false or fraudulent pretenses, representations, or promises. United States v. Medeles, 916 F.2d 195, 198 (5th Cir.1990); United States v. Schwartz, 899 F.2d 243, 246 (3rd Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 259, 112 L.Ed.2d 217 (1990); United States v. Bonnett, 877 F.2d 1450, 1453-54 (10th Cir.1989).[28] The Government charged only that the Falcones violated subsection (a)(2).
 
 
 39
 To show a violation of section 1344(a)(2), the government must prove three elements: (1) that a scheme or artifice to obtain money, funds, or credits under the custody or control of a federally insured financial institution existed; (2) that the defendant participated in the scheme by means of false pretenses, representations, or promises, which were material; and (3) that the defendant acted knowingly. United States v. Swearingen, 858 F.2d 1555, 1556 (11th Cir.1988) (per curiam), cert. denied, 489 U.S. 1083, 109 S.Ct. 1540, 103 L.Ed.2d 844 (1989); see also United States v. Goldblatt, 813 F.2d 619, 625 (3rd Cir.1987). The Tenth Circuit, in United States v. Bonnett, 877 F.2d 1450, 1456 (10th Cir.1989), defined a "representation" under section 1344(a)(2) as "words, made orally or in writing, or other conduct manifesting to another the existence of a material present or past fact." Cf. United States v. Ryan, 828 F.2d 1010, 1017 (3rd Cir.1987) ("statement" for purposes of section 1014 may include "assertive non-verbal conduct").
 
 
 40
 The evidence in this case, taken in the light most favorable to the Government, shows that the Falcones obtained OGA funds that were in the custody of Orange State, on four occasions, by using a facsimile stamp of Duke Peay's signature without his authorization. The Falcones argue, however, that because their presentations of the checks bearing the signature stamp were not false or fraudulent representations under Williams v. United States, 458 U.S. 279, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982), they may not be convicted under section 1344(a)(2). We disagree.
 
 
 41
 In Williams, five justices of the United States Supreme Court held that when the defendant, William Williams, deposited several checks that were not supported by sufficient funds in his accounts (as part of a check-kiting scheme designed to inflate the balances in his accounts so that he could receive the interest-free use of bank funds, see id. at 281 n. 1, 102 S.Ct. at 3089 n. 1), he did not make false statements under 18 U.S.C. Sec. 1014.[29] The government argued that by presenting a check, Williams made an implied representation that he had sufficient funds in his account to cover the check. Rejecting this argument, the Court reasoned that "technically speaking, a check is not a factual assertion at all, and therefore cannot be characterized as 'true' or 'false.' " Williams, 458 U.S. at 284, 102 S.Ct. at 3091. A check "serve[s] only to direct the drawee bank[ ] to pay the face amount[ ] to the bearer, while committing the [drawer of the check] to make good the obligation[ ] if the bank[ ] dishonor[s] the draft[ ]"; the check itself does not "make any representation as to the state of the [drawer's] bank balance." Id.
 
 
 42
 The Falcones urge us to read Williams broadly, arguing that Williams holds that the presentation of a check to a bank can never be a representation; they therefore made no representation under section 1344(a)(2) when they, without authorization, presented checks stamped with Peay's signature. We hold, however, that Williams does not govern this case. Williams stands only for the proposition that the simple presentation of a check drawn on an account with insufficient funds, without other evidence that the defendant made some false representation to the bank, is not a statement or representation, because it is only an order to the bank to pay the amount shown and a promise that the maker of the check will pay any amount the bank refuses to pay.
 
 
 43
 Our narrow reading of Williams is supported by the cases that follow it. Post-Williams courts have consistently held that presenting a bad check or engaging in a check-kiting scheme by presenting a series of bad checks is not a false representation within the terms of section 1344(a)(2) or other criminal statutes that require the government to show that the defendant made a false statement or representation. See, e.g., Medeles, 916 F.2d at 202 (check kiting not false representation under section 1344(a)(2)); United States v. Cronic, 900 F.2d 1511, 1516 (10th Cir.1990) ("a bare check kiting scheme, unembellished by other acts or communications, does not violate the false ... representations ... clause of the mail fraud statute"); United States v. Frankel, 721 F.2d 917, 919 (3rd Cir.1983) (check kiting not false statement under mail and wire fraud statutes); cf. United States v. Elliott, 689 F.2d 178 (10th Cir.1982) (payment of debt with bad check signed by third party not false statement to the Small Business Administration under 15 U.S.C. Sec. 645(a) (1988)).[30]
 
 
 44
 Most courts, including our own, however, have declined to read Williams broadly to require the reversal of convictions in situations other than those involving insufficient-funds checks. In United States v. Swearingen, 858 F.2d 1555 (11th Cir.1988) (per curiam), cert. denied, 489 U.S. 1083, 109 S.Ct. 1540, 103 L.Ed.2d 844 (1989), for instance, this circuit addressed a scheme in which the defendant, Sherman Swearingen, who owned an automobile dealership, presented his bank with sight drafts[31] signed by a co-conspirator, Alton Millian, who also owned a dealership. Each sight draft represented a promise by one conspirator to pay the other for a fictitious automobile sale; the conspirators attached false documents transferring title to each draft. When their banks received these drafts, they credited Swearingen's and Millian's accounts with the amounts shown on the drafts; by continually trading and presenting drafts, Swearingen and Millian maintained artificially inflated balances and received interest-free credit from their banks. The government charged that this scheme violated section 1344(a)(2). Swearingen argued that the sight drafts, like the bad checks in Williams, were not representations, as they were only promises to pay. A panel of this court disagreed and affirmed his conviction, reasoning that the conspirators knew that the banks believed that the drafts "represented actual, legitimate sales of vehicles" and used this belief to deceive the banks into crediting the accounts; they therefore made "false factual assertion[s]" each time they presented a draft. Id. at 1557.[32]
 
 
 45
 Williams does not govern a situation in which some information on the check, such as a false signature, Prushinowski v. United States, 562 F.Supp. 151, 156-58 (S.D.N.Y.), aff'd mem., 742 F.2d 1436 (3rd Cir.1983),[33] or a fictitious bank, United States v. Worthington, 822 F.2d 315, 319 (2d Cir.), cert. denied, 484 U.S. 944, 108 S.Ct. 331, 98 L.Ed.2d 358 (1987),[34] is itself a false statement, or in which the maker of an insufficient-funds check engages in behavior, other than the simple presentation of the check, that constitutes a false representation, Bonnett, 877 F.2d at 1457. Cf. United States v. Price, 763 F.2d 640, 643 & n. 3 (4th Cir.1985) ("there is nothing in Williams that equates the passing of checks drawn on accounts with insufficient funds with fraudulently making or altering a document"; "bad check," covered by Williams, does not mean "forged or altered" check).[35]
 
 
 46
 Because we conclude that Williams does not govern this case, we must decide whether the Falcones' presentations of checks stamped, without authorization, with Peay's signature were false representations to Orange State. We believe that the Falcones' unauthorized uses of the signature stamp were false representations, "akin to ... forger[ies]." Price, 763 F.2d at 643. The Falcones knew that Orange State believed, pursuant to OGA's corporate resolution filed at the bank, that when a check bearing the two required signatures was presented, the check was an authorized corporate withdrawal from OGA's accounts. When they presented the checks bearing the signature stamp, they made false representations to the bank that Peay, and, hence, OGA, had authorized the withdrawal of the funds, and thereby deceived the bank into releasing the OGA funds. Their conduct falls squarely within the parameters of section 1344(a)(2); we therefore affirm their convictions on counts V-VIII.
 
 2.
 
 47
 Robert Falcone argues that the evidence was insufficient to support his section 1344(a)(2) convictions for obtaining money from Orange State with the checks stamped with Peay's signature without Peay's authorization. Falcone points out that OGA's articles of incorporation provided that the shareholders, not a board of directors, would manage the corporation; the articles, moreover, did not specifically require that the shareholders act as a majority or quorum when they exercised their management power. He contends, therefore, that Sandra Falcone, as a minority shareholder, could, without the knowledge or consent of the other shareholder/directors or officers of the corporation, validly define permitted uses for and use the signature stamp, especially as no corporate resolution expressly forbade or limited use of the stamp. That Peay himself did not authorize the use of the stamp on the checks, according to Falcone, is irrelevant, because Peay was not a shareholder and thus had no power to take corporate action. Falcone concludes that Sandra Falcone's use of the stamp, or his own use pursuant to her authorization, could not be a false or fraudulent representation. We disagree.
 
 
 48
 In Florida, the board of directors of a corporation generally manage the company, and the shareholders are "without power, aside from that which is delegated to them as agents, to represent the corporation or act for it in relation to its normal business." Mease v. Warm Mineral Springs, Inc., 128 So.2d 174, 179 (Fla.Dist.Ct.App.), cert. denied, 132 So.2d 291 (Fla.1961); see also Fla.Stat. Sec. 607.111(1) (1977) (repealed 1990). Florida corporation law in effect when OGA was incorporated, however, did permit a corporation, in its articles of incorporation, to provide that the shareholders, rather than the board, would manage the corporation. See id.[36] Thus, Falcone is correct that, under OGA's articles of incorporation, the shareholders retained management power.
 
 
 49
 Falcone cites no law in support of the proposition that when a corporation's articles provide that the shareholders will manage the corporation but do not expressly provide that they must act collectively or by majority vote, any minority shareholder may, without the assent or knowledge of the other shareholders, make management decisions and act for the corporation. It is perhaps arguable that such a clause in the articles, if the shareholders make no further provision--in the bylaws or otherwise--defining the way in which they will exercise their management power, allows each shareholder unilaterally to function as a general manager of the corporation--essentially turning the corporation into a partnership. In that case, each shareholder would have the power to act individually for the corporation, constrained only by her fiduciary duty to the corporation and the other shareholders. We note, however, that such a result, in a corporation with several shareholders, might lead quickly to anarchy.
 
 
 50
 We do not decide, however, whether Falcone's interpretation of this clause in OGA's articles is correct under Florida law, because the shareholders of OGA, exercising their management power, chose, in early 1985, to elect themselves (plus Wayne Dent) as a board of directors. Essentially, the shareholders decided that they would manage the corporation collectively, acting as a board of directors; they therefore defined the manner in which they intended to exercise the general management powers granted them by the articles. As board members, the shareholders could act collectively by majority vote taken at a meeting, see id. Sec. 607.121 (1977) (repealed 1990), or by unanimous written consent to action taken without meeting, see id. Sec. 607.134 (1977) (repealed 1990), or, because OGA was a close corporation, in limited circumstances by an informal meeting or discussion of all shareholder/directors, see Etheredge v. Barrow, 102 So.2d 660, 663 (Fla.Dist.Ct.App.1958). Each shareholder/director could not, however, act for the corporation individually unless a majority of the shareholder/directors, acting as a board, had given the individual shareholder general management power or express or implied authority to act. 5 W. Fletcher, Cyclopedia of the Law of Private Corporations Sec. 2101, at 527 (rev. perm. ed. 1987) ("[t]he directors ... of a corporation are vested with its management, not as individuals, but as a board and, as a general rule, they can act so as to bind the corporation only when they act as a board and at a legal meeting").
 
 
 51
 Acting collectively, the shareholder/directors appointed officers (Rillo, as president and treasurer; Peay, as vice president; and Sandra Falcone, as secretary) to run OGA's day-to-day business. They also passed a corporate resolution requiring two signatures on OGA's banking transactions at Orange State.[37]
 
 
 52
 Contrary to Falcone's assertion, therefore, Peay could authorize the use of, and define permitted uses for, the signature stamp. Pursuant to the corporate banking resolution, validly passed by the shareholders acting as a board of directors, Peay was a required signor on the Orange State accounts. As such, he could sign OGA checks individually or authorize an agent to affix his signature, either by hand or by the use of a signature stamp. He testified, at trial, that he did authorize the use of such a stamp for limited purposes. See supra note 10.
 
 
 53
 After the shareholders decided to manage the corporation as a board and appointed officers, Sandra Falcone could act for the corporation in two capacities, as one member of the board of directors or as secretary. As a board member, she could not act individually, and there is no evidence that the board ever expressly or impliedly granted her the power to circumvent the requirement that Peay sign (and, thus, authorize) all checks. See 5 W. Fletcher, supra p. 1543, Sec. 2101, at 527.
 
 
 54
 As secretary, likewise, she had no authority inherent in her office to expand the permitted uses of the stamp, or to use it in a manner that Peay had not authorized. Under Florida law, "[t]he Secretary of a corporation, merely as such, is a ministerial officer, without authority to transact the business of the corporation upon his volition and judgment." Ideal Foods, Inc. v. Action Leasing Corp., 413 So.2d 416, 417 (Fla.Dist.Ct.App.1982). A secretary "has none of the powers of a general or managing agent," 2A W. Fletcher, supra p. 1543, Sec. 637, at 182, and "has no power by virtue of his office to execute ... checks," id. Sec. 641, at 191. Although the Secretary, "[l]ike every other corporate agent," "may have more extensive functions then those ordinarily incident to the office," Ideal Foods, 413 So.2d at 417 n. 1, there is no evidence in this case that Sandra Falcone's power as secretary was more extensive than the norm or that the board ever granted her express or implied authority to designate new uses for the stamp or to use it without Peay's authorization; indeed, the testimony at trial indicated that she had very little to do with the day-to-day operation and management of the company.[38]
 
 
 55
 In neither of her roles, therefore, did Sandra Falcone have the authority or power, either inherent in her position or expressly or impliedly granted by the shareholder/directors, individually to authorize the use of the stamp of Peay's signature for purposes beyond the limited ones he had approved or to stamp checks with Peay's signature without his authorization.[39]C.
 
 1.
 
 56
 Both Falcones challenge their 18 U.S.C. Sec. 1344(a)(2) convictions (count IX) for presenting a false corporate resolution to Barnett Bank. They point out that section 1344(a)(2) requires that the funds in the custody of the bank be obtained "by means of" a false representation; thus, they argue, because Barnett Bank did not have custody of the funds when they presented the false resolution (indeed, the Falcones engineered both deposits and withdrawals from the account), the false resolution was not the means by which they obtained the funds, and their actions are insufficient, in law, to support their convictions. We disagree.
 
 
 57
 The Falcones cite no law to support their narrow interpretation of the statute; moreover, the legislative history of section 1344 indicates that it should be construed broadly, as courts have construed the mail and wire fraud statutes on which it is based, to reach "a wide range of fraudulent activity." S.Rep. No. 225, 98th Cong., 2d Sess. 378, reprinted in 1984 U.S.Code Cong. & Admin.News 3182, 3519. We find that section 1344(a)(2) contains no requirement that the funds be in the custody or control of the bank at the time the false or fraudulent representation is made. By filing a false corporate resolution, the Falcones opened the account at Barnett Bank in the name of OGA and established that they would have access to the funds using only one signature; they then deposited OGA funds in the account, and later withdrew them with only one signature, pursuant to the false resolution they had filed earlier. In this situation, they obtained money in the custody of the bank by means of the false resolution.
 
 2.
 
 58
 The Falcones also argue that the false corporate resolution was not a material representation; they could easily have opened an account in their own names or in the name of another corporation they owned and transferred OGA funds to that account. We disagree.
 
 
 59
 A false representation under section 1344(a)(2) must be material. Swearingen, 858 F.2d at 1556. A misrepresentation is material when it is "capable of influencing the [b]ank's actions," id. at 1558 (citing United States v. Scott, 701 F.2d 1340, 1345 (11th Cir.), cert. denied, 464 U.S. 856, 104 S.Ct. 175, 78 L.Ed.2d 158 (1983)), that is, when it "would be of importance to a reasonable banking institution" in deciding whether to act as the defendant wishes. Id. Moreover, whether a misrepresentation is material "depends to some degree on the fraudulent intent" of the defendant. Id. So long as a defendant, in order to cause a bank to take some action, makes a misrepresentation that a reasonable bank would consider important in deciding whether to act as the defendant wishes, and intends by this representation to "deceive the [b]ank, in the furtherance of fraud," id., the misrepresentation is material, even if the bank does not act as the defendant desires or does not actually rely on the misrepresentation in so acting, id.; Scott, 701 F.2d at 1345; "[i]t does not lie with one knowingly making false statements with intent to mislead ... to say that the statements were not influential or the information not important," id. (quoting Kay v. United States, 303 U.S. 1, 5-6, 58 S.Ct. 468, 471, 82 L.Ed. 607 (1938)).
 
 
 60
 In this case, the evidence taken in the light most favorable to the Government shows that the false corporate resolution the Falcones filed was a material misrepresentation. It was capable of influencing Barnett Bank's actions, in that it deceived the bank into opening an account in the name of OGA in which the Falcones could deposit checks payable to the company and later withdraw funds with only one signature.
 
 3.
 
 61
 Robert Falcone challenges his section 1344(a)(2) conviction for presenting the false corporate resolution to Barnett Bank; Falcone argues that (1) the original corporate resolution requiring two signatures on OGA banking transactions was invalid, because it purported to be passed by a board of directors but the articles provided that the shareholders would manage the corporation, or, alternatively, because it was passed before the shareholders received their stock and elected the board, see supra note 37, and (2) Sandra Falcone, as a minority shareholder who had management power under the articles, had authority to open the Barnett Bank account and file the resolution authorizing withdrawal of funds with one signature. The resolution filed with Barnett Bank was not, therefore, a false or fraudulent representation. We disagree.
 
 
 62
 The validity of the original corporate resolution requiring two signatures is irrelevant to whether the corporate resolution filed at Barnett Bank was a false representation. The original resolution required two signatures only on transactions on the Orange State accounts, see supra p. 1531 & note 3; the corporation certainly could have passed, at any time, a new resolution authorizing an agent to open an account at Barnett Bank with only one required signature. The issue, thus, is whether the Falcones, by filing such a resolution with Barnett Bank, truthfully represented a corporate action or whether Sandra Falcone, acting as a minority shareholder, director, or secretary, had the power to take such a corporate action on her own.
 
 
 63
 We do not reach the question of whether Sandra Falcone could unilaterally enact such a resolution as a minority shareholder who had management power under the articles of incorporation, as we find that the shareholders elected to manage the corporation collectively as a board of directors. See supra 1543-44. After this decision, Sandra Falcone's authority to manage the corporation could be exercised either as a member of the board or as secretary. In neither of these capacities did she have power or authority to enact a corporate resolution without the assent or knowledge of the other shareholder/directors. One member of the board may not enact a corporate resolution; the essence of a resolution is that it is the decision of the majority of the board of directors. Cf. Fla.Stat. Secs. 607.121, .134 (board of directors may act as majority at meeting or unanimously without meeting); 19 W. Fletcher, supra p. 1543, Sec. 8950, at 134-35.
 
 
 64
 As secretary, Sandra Falcone had the authority, either inherent in her office, see 2A id. Sec. 651, at 204 ("the secretary has power to certify that a copy of a resolution of the board of directors is a true copy"), or expressly or impliedly granted by the board, to certify to banks that OGA had passed corporate resolutions permitting a corporate agent to open a legitimate account at the bank.[40] This authority did not, however, extend so far as to allow her, as secretary, unilaterally to enact corporate resolutions opening new bank accounts without the knowledge of the other shareholder/directors and officers and to change the established corporate practice of requiring two signatures on accounts.[41] See Ideal Foods, 413 So.2d at 417.[42]
 
 D.
 
 65
 Finally, Robert Falcone challenges his 18 U.S.C. Sec. 2113(b)[43] convictions (counts XII, XIII) for bank larceny. The essential elements of section 2113(b) are (1) the defendant took and carried away money, property, or another thing of value from a bank; (2) the money, property, or thing of value was worth more than $100; (3) the money, property, or thing of value was in the care, custody, control, management, or possession of the bank; and (4) the defendant intended to steal or purloin the money, property, or thing of value. Goldblatt, 813 F.2d at 625.
 
 
 66
 Falcone argues that the evidence was insufficient to support his section 2113(b) conviction for taking money from the custody of Orange State and using it to pay his mortgage or conveying it to his teenage son. He asserts that when he and his wife withdrew these funds, OGA was entitled to a provisional commission of 12.5% of approximately six to eight million dollars, which OGA had on deposit. Because OGA was a subchapter S corporation, moreover, he contends that twenty-five percent of the provisional commission would eventually have gone to Sandra Falcone. Although Falcone admits that the amount of the provisional commission owed to OGA eventually was reduced due to the company's high loss ratios, see supra note 8, he argues that American Excel did not calculate the amount of this reduction (and, thus, OGA did not lose its right to these funds) until early 1987. We disagree.
 
 
 67
 Under Florida law, the OGA funds the Falcones took belonged not to the individual shareholders but to the corporation, until the corporation, in its discretion, declared a dividend or other distribution. See Fla.Stat. Sec. 607.137 (1977) (repealed 1990); Mease, 128 So.2d at 179 ("The stockholders do not have vested in them title in the corporate property."); In re Estate of Parker, 110 So.2d 498, 503 (Fla.Dist.Ct.App.) ("A share of corporate stock entitles the shareholder to an undivided share of profits of the corporation which may be declared from time to time in the form of dividends...."), cert. denied, 114 So.2d 3 (Fla.1959); see also 11 W. Fletcher, supra p. 1543, Sec. 5325, at 744 ("whether or not dividends shall be paid, and the amount of the dividend at any time, is primarily to be determined by the directors, and there must be bad faith or a clear abuse of discretion on their part to justify a court of equity in interfering."). As the discussion in sections III.B.2 and III.C.3 indicates, Sandra Falcone, as shareholder, director, or officer, had no power unilaterally to declare a dividend or distribution of OGA funds. Moreover, none of the other three shareholder/directors approved any distribution or dividend to Sandra Falcone or authorized the Falcones to use OGA funds to pay personal expenses.
 
 
 68
 OGA's status as a subchapter S corporation under the federal tax laws, by which it and its shareholders receive favorable tax treatment, does not change this result under Florida law. See Little v. Caswell-Doyle-Jones Corp., 305 So.2d 842, 844 (Fla.Dist.Ct.App.1975) ("The law of this jurisdiction as to corporate structure is not amended or engrafted upon by the intricacies of tax advantages or disadvantages of the Federal Internal Revenue Code."). Falcone contends that because the corporation elected subchapter S status, all of its profits were owed to the shareholders. This argument misconceives the effect of a subchapter S election: although the shareholders of a subchapter S corporation report, pay taxes on, and take deductions for a pro rata share of the corporation's income and losses on their personal tax returns, the corporation retains its income until the board of directors, in its discretion, declares a dividend. See 1 O'Neal's Close Corporations, supra note 1, Sec. 2.06, at 34 (in subchapter S corporation, "shareholder is taxed on his proportionate part of corporate income, even though income is not actually distributed to him," because "declaration of dividends is entirely within the discretion of the corporation's board of directors"). OGA's profits, therefore, remained OGA's property until a majority of its shareholder/directors declared a dividend or distribution.
 
 IV.
 
 69
 For the reasons stated, we REVERSE the Falcones' convictions under 18 U.S.C. Sec. 371, but AFFIRM their convictions under 18 U.S.C. Secs. 2, 1344(a)(2), and 2113(a)-(b).
 
 
 70
 IT IS SO ORDERED.
 
 
 71
 TJOFLAT, Chief Judge, specially concurring, in which POWELL, Associate Justice, and KRAVITCH, Circuit Judge, join:
 
 
 72
 Because we are bound to follow circuit precedent as established by United States v. Hope, 861 F.2d 1574 (11th Cir.1988) (Hope I ), and United States v. Hope, 901 F.2d 1013 (11th Cir.1990) (per curiam), application for stay of mandate and cert. denied, --- U.S. ----, 111 S.Ct. 713, 112 L.Ed.2d 702 (1991) (Hope II ), I concur in the judgment of the court reversing the Falcones' convictions for conspiring to commit an offense against the United States under 18 U.S.C. Sec. 371 (1988). I write separately, however, to express my reservations with the Hope opinions. Although I was on the panel in Hope I and joined the opinion in that case, I feel upon further reflection that the decision was an unfortunate extension of Tanner v. United States, 483 U.S. 107, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987).
 
 
 73
 As the per curiam opinion of the court states, Tanner held only that the United States must be the target of a conspiracy under the defraud clause of section 371; it did not address the offense clause, and any language in the decision which might be interpreted as referring to that clause is dicta. As the following discussion indicates, Hope I 's extension of Tanner to the offense clause is not supported by the language of the statute, its legislative history, or our caselaw.
 
 
 74
 The precursor of section 371, which was enacted in 1867, provided criminal penalties for conspiracies "to commit any offense against the laws of the United States " and "to defraud the United States." Act of March 2, 1867, ch. 169, Sec. 30, 14 Stat. 471, 484 (emphasis added). It is clear that under this original enactment, the United States need not be the target of a conspiracy under the offense clause, as the statute explicitly outlaws conspiracies to violate federal laws.
 
 
 75
 In 1873, Congress revised and codified the section at Rev.Stat. Sec. 5440; its language was changed to its present form, to criminalize conspiracies "to commit any offense against the United States" and to defraud the United States. This omission--of the words "the laws of" between "against" and "the"--was not, however, intended to change the substantive meaning of the statute. The revision was part of a general revision of federal statutes authorized by Congress in 1866; the revisors were directed to "revise, simplify, arrange, and consolidate" the federal statutes and to "mak[e] such alterations as may be necessary to reconcile the contradictions, supply the omissions, and amend the imperfections of the original text." Act of June 27, 1866, ch. 140, Secs. 1, 2, 14 Stat. 74, 74-75.
 
 
 76
 Accordingly, courts that interpreted revised section 5440 held that the omission of the words "the laws of" the United States from the offense clause did not change the meaning of the statute, and consistently interpreted the phrase "any offense against the United States" to mean "any offense made a crime by the laws of the United States." See Radin v. United States, 189 F. 568, 571 (2nd Cir.1911) ("The words 'any offense against the United States' in section 5440 have been construed to include any offense made a crime by the laws of the United States."); Thomas v. United States, 156 F. 897, 899, 901 (8th Cir.1907) (revisors of the statute did not change the meaning of the original act; "Congress is in the habit of using the formula 'offense against the United States' interchangeably ... with 'offense against the laws of the United States,' and ... both mean the same thing"; "section 5440 was intended as a broad and comprehensive provision denouncing conspiracies to commit offenses created by any of the statutes of the United States as a crime"); Scott v. United States, 130 F. 429, 432 (6th Cir.1904) (revision was "mere change of form" and "[t]he meaning remained the same"; "uniform holding of the courts of the United States" is that "[t]he object of the conspiracy must be to commit some offense against the United States in the sense only that it must be to do some act made an offense by the laws of the United States"); In re Wolf, 27 F. 606, 611 (W.D.Ark.1886) ("[t]he object of the conspiracy must be to commit some offense against the United States; that is, to do some act made a crime by the laws of the United States"); United States v. Watson, 17 F. 145, 148 (N.D.Miss.1883) (using similar language); United States v. Sanche, 7 F. 715, 718-19 (W.D.Tenn.1881) ("The revisers had no power to alter the law."; section 5440 is not restricted to "such 'offenses' as operate to injure the government itself, but ... covers every conspiracy to commit an act made an 'offense' or crime by any law of the United States"). Indeed, the Supreme Court stated, when it held that the offense clause of section 5440 covered conspiracies to violate all federal statutes, even if they do not provide criminal penalties, that
 
 
 77
 a conspiracy to commit any offense which by act of Congress is prohibited in the interest of the public policy of the United States, although not of itself made punishable by criminal prosecution ... is a conspiracy to commit an "offense against the United States."
 
 
 78
 United States v. Hutto, 256 U.S. 524, 529, 41 S.Ct. 541, 543, 65 L.Ed. 1073 (1921) (emphasis added).
 
 
 79
 In 1948, Congress enacted the modern section 371, which contained essentially the same language as section 5440, again as part of a revision of the criminal statutes. Act of June 25, 1948, Pub.L. No. 772, ch. 645, Sec. 371. Only one other circuit, apart from the panels in Hope I and Hope II, has considered whether the United States must be the target of a conspiracy under the offense clause of section 371 since the Supreme Court decided Tanner. In United States v. Gibson, 881 F.2d 318 (6th Cir.1989), the government, like the government in Hope I, charged the defendants in one count with both a conspiracy to defraud the United States and a conspiracy to commit an offense against the United States by violating a federal statute. The Sixth Circuit, stating that Hope I "should [have been] decided the other way," found that "[i]t has long been established that the words 'offense against the United States' encompass all offenses against the laws of the United States, not just offenses directed against the United States as target or victim.... We do not believe the Tanner decision was intended to redefine the words 'offense against the United States.' " Id. at 321 (citations omitted); cf. United States v. Minarik, 875 F.2d 1186, 1187 (6th Cir.1989) (offense clause criminalizes "conspiracies to commit offenses specifically defined elsewhere in the federal criminal code"); United States v. Tuohey, 867 F.2d 534, 536 (9th Cir.1989) ("a civil violation of law may be an 'offense' for purposes of [the offense clause of section 371]"). Our circuit, therefore, seems to be the only one that holds that the United States must be the target of a conspiracy to commit an offense against the United States.
 
 
 80
 Moreover, I do not think that the Tanner Court intended to remove from the offense clause of section 371 the wide range of conspiracies to violate laws of the United States, such as conspiracies to commit mail, wire, and bank fraud, see 18 U.S.C. Secs. 1341, 1343, 1344 (1988), which have traditionally been prosecuted under this section. This circuit, both before and after Tanner and Hope I, has consistently affirmed convictions under the offense clause of section 371 when the conspirators, rather than targeting the United States, merely conspired to violate a federal statute; some of these cases involve conspiracies targeting federally insured banks under 18 U.S.C. Secs. 1344 and 2113 (1988), the statutes at issue in this case. While I realize that these cases do not specifically address the issue raised here, they do illustrate that the government has successfully prosecuted a wide range of conspiracies to violate different federal laws under the offense clause of section 371 in many situations in which the United States was not a target of the conspiracy. See, e.g., United States v. Keller, 916 F.2d 628, 630 (11th Cir.1990) (conspiracy to commit armed bank robbery in violation of 18 U.S.C. Sec. 2113(a)); United States v. Rowe, 906 F.2d 654, 655 (11th Cir.1990) (conspiracy to commit wire fraud in connection with scheme to defraud insurance company); United States v. Funt, 896 F.2d 1288, 1290-91 (11th Cir.1990) (conspiracy to commit mail and wire fraud and to transport stolen property across state lines in connection with fraudulent coin sales scheme); United States v. LaFraugh, 893 F.2d 314 (11th Cir.) (conspiracy to commit mail fraud, wire fraud, and fraud using access devices in connection with scheme to defraud U.S. Sprint), cert. denied, --- U.S. ----, 110 S.Ct. 2601, 110 L.Ed.2d 281 (1990); Lomelo v. United States, 891 F.2d 1512, 1513 (11th Cir.1990) (conspiracy to commit mail fraud in connection with fraud on city); United States v. Rapp, 871 F.2d 957 (11th Cir.) (conspiracy to commit bank and wire fraud, to misapply bank funds, and to make false statements to bank in connection with loan application), cert. denied, --- U.S. ----, 110 S.Ct. 233, 107 L.Ed.2d 184 (1989); United States v. Diwan, 864 F.2d 715 (11th Cir.) (conspiracy to persuade minor to pose for sexually explicit photographs in violation of 18 U.S.C. Sec. 2251 (1984)), cert. denied, 492 U.S. 921, 109 S.Ct. 3249, 106 L.Ed.2d 595 (1989); United States v. Swearingen, 858 F.2d 1555, 1556 (11th Cir.1988) (per curiam) (conspiracy to commit bank fraud), cert. denied, 489 U.S. 1083, 109 S.Ct. 1540, 1548, 103 L.Ed.2d 844 (1989); United States v. Petit, 841 F.2d 1546 (11th Cir.) (conspiracy to possess goods stolen from interstate commerce), cert. denied, 487 U.S. 1237, 108 S.Ct. 2906, 101 L.Ed.2d 938 (1988); United States v. Lasteed, 832 F.2d 1240, 1241 (11th Cir.1987) (conspiracy to commit mail and wire fraud and to induce interstate travel in connection with fraudulent investment scheme for transforming water into gasoline), cert. denied, 485 U.S. 1022, 108 S.Ct. 1578, 99 L.Ed.2d 893 (1988); United States v. Corley, 824 F.2d 931, 932 (11th Cir.1987) (conspiracy to defraud savings and loan); United States v. Adams, 785 F.2d 917, 918 (11th Cir.) (conspiracy to transport stolen vehicles in interstate commerce), cert. denied, 479 U.S. 858, 107 S.Ct. 202, 93 L.Ed.2d 133 (1986), and cert. denied, 479 U.S. 1009, 107 S.Ct. 650, 93 L.Ed.2d 706 (1986); United States v. Sarro, 742 F.2d 1286, 1289 (11th Cir.1984) (conspiracy to transport stolen paintings in interstate commerce).
 
 
 81
 Furthermore, that many of the other provisions of title 18 of the United States Code use the phrase "offense against the United States" to indicate a violation of any law of the United States also shows that Hope I was an unfortunate extension of Tanner. See, e.g., 18 U.S.C. Sec. 2 (1988) (punishing as principals those who commit, cause commission of, or aid and abet commission of "offense against the United States"); id. Sec. 3 (1988) (one who aids offender "knowing that an offense against the United States has been committed" is accessory after the fact); id. Sec. 245(c) (1988) (law enforcement officer is one with power to investigate and make arrests for "offenses against the United States"); id. Sec. 3013 (1988) (special assessment of costs for persons convicted of "offense against the United States"); id. Sec. 3041 (1988) (judges and magistrate judges have power to arrest, imprison, or release, before trial, one who commits "offense against the United States"); id. Secs. 3052, 3053, 3056(c)(1)(C), 3061 (1988) (Federal Bureau of Investigation agents, United States marshals, Secret Service agents, and postal inspectors have power to arrest without warrant anyone who commits "offense against the United States" in their presence); id. Sec. 3237(a) (1988) (any "offense against the United States" committed in two or more districts may be investigated and prosecuted in any one of districts where criminal behavior occurred); id. Sec. 3681(a) (1988) (court may order forfeiture of profits from depiction of crime in book or movie received by one who commits "offense against the United States" resulting in physical harm to individual); id. Sec. 4042(2) (1988) (Bureau of Prisons must provide quarters and care for all charged with or convicted of "offenses against the United States"); id. Sec. 5002 (1988) (Advisory Corrections Council created to advise appropriate officials about issues relating to those convicted of "offenses against the United States").
 
 
 82
 For these reasons, I believe Hope I and Hope II were wrongly decided. I reluctantly concur in our reversal of the Falcones' section 371 convictions.
 
 
 
 *
 Honorable Lewis F. Powell, Jr., Associate Justice of the United States Supreme Court, Retired, sitting by designation
 
 
 [1]
 Federal tax law, 26 U.S.C. Secs. 1361-79 (1988), provides that certain small corporations, such as OGA, may elect subchapter S status. A subchapter S corporation usually pays no income tax; instead, each shareholder reports a pro rata share of the corporation's income and expenses on his or her personal tax return. The subchapter S corporation thus avoids the "double tax" imposed by federal tax law on other corporations, under which the corporation first pays tax on its income, and the shareholders then pay tax on the income that is distributed to them. See Ad-Vantage Tel. Directory Consultants v. GTE Directories Corp., 849 F.2d 1336, 1352 (11th Cir.1987). See generally 1 F. O'Neal & R. Thompson, Close Corporations Sec. 2.06 (3rd ed. 1986) [hereinafter O'Neal's Close Corporations]
 
 
 [2]
 The articles of incorporation stated: "The business of the corporation shall be managed by the stockholders of the corporation rather than by a Board of Directors."
 
 
 [3]
 Under this resolution, the two signature requirement applied only to OGA accounts at Orange State. James and O'Connell indicated in their testimony that they believed that two signatures were necessary to withdraw money from all OGA accounts; O'Connell stated that American Excel customarily required all general agencies writing American Excel policies to have two signatures for accounts. Sandra Falcone, on the other hand, testified that she knew that two signatures were required on all accounts at Orange State and thought that two signatures would be required on OGA's accounts at other banks only if Peay accompanied the Falcones to open the accounts
 
 
 [4]
 For instance, each shareholder who testified at trial asserted that the statement in the minutes that Robert Falcone, Robert Walker, and Jeanette Solis (an Insurance Connection employee) were present at the January 15, 1985 organizational meeting is incorrect. Sandra Falcone testified that no meeting took place on January 15 and that the only organizational meeting for the company occurred on February 14, 1985; other witnesses contradicted this statement, referring either to two separate meetings or to one meeting in mid-January
 
 
 [5]
 Peay testified that he was appointed president at an informal meeting of the shareholder/directors attended by James, Sandra Falcone, and Wayne Dent (who represented O'Connell and Walker). No formal corporate resolution or shareholder or director vote recorded in the corporate minute book memorializes his appointment
 
 
 [6]
 The contract between OGA and American Excel provided that 27.5% of the funds were OGA's provisional commission. OGA owed 15% of the total funds it collected, however, to the retail agents as commissions for policies they sold to the public; this left OGA with a 12.5% provisional commission. If, at the end of the year, the loss ratio on the business OGA wrote was high (that is, if the amount American Excel had to pay for claims made on policies substantially exceeded the amount of premiums it collected, so that American Excel was obliged to pay claims from its capital investments rather than from collected premiums), OGA would return part of this provisional commission to American Excel; if the loss ratio was low, OGA's commission would increase. OGA also retained the interest earned by the funds while they were in its bank accounts
 
 
 [7]
 O'Connell testified that overhead for most general agencies was 10% of total premiums. Peay testified that OGA's overhead ran at about 5-6%
 
 
 [8]
 Peay testified that by the end of 1985, OGA's tentative profit (its provisional commissions minus its expenses) was approximately $325,000. Because of OGA's high loss ratios, however, American Excel later notified OGA that the provisional commission would be adjusted and that it owed American Excel approximately $269,000. OGA's profit, after this adjustment, was approximately $56,000. Peay testified, however, that because OGA also had to return unearned premiums to policyholders, it actually lost money in 1985
 
 
 [9]
 A Commerce Bank employee testified that the Peay signature on the signature card filed with this account was "completely different" from an earlier Peay signature on file. Peay testified that the signature was not his and denied having authorized anyone to sign for him. Sandra Falcone, to the contrary, testified that Peay accompanied the Falcones to Commerce Bank to open the account and signed the card at that time
 
 
 [10]
 Peay testified that he authorized OGA, which had his signature stamp, to use it only to stamp policies as they were issued and to stamp computer-generated refund checks for overpaid premiums
 
 
 [11]
 Sandra Falcone testified that the Falcones did this because Peay was unavailable to sign the signature card when they opened the account
 
 
 [12]
 Sandra Falcone testified that the Falcones did this to prevent problems with lost mail, because OGA had not received an expected interest check from one of its banks
 
 
 [13]
 The Falcones had opened this account in late 1984. Only one of their signatures was required to withdraw funds
 
 
 [14]
 According to Cindy Cook, OGA's office manager, Robert Falcone, on that day, told her that only one signature, his own, was needed to draw checks
 
 
 [15]
 Each shareholder in OGA had signed an individual guarantee to American Excel that OGA would meet its premium payments to American Excel. In early 1986, OGA asked O'Connell, James, and Walker to pay, and each paid, $90,000 on these guarantees because of an adjustment in OGA's provisional commission, see supra note 8
 
 
 [16]
 18 U.S.C. Sec. 371 states, in pertinent part:
 If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.
 
 
 [17]
 18 U.S.C. Sec. 2 states:
 (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
 (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.
 
 
 [18]
 18 U.S.C. Sec. 1014 states, in pertinent part:
 Whoever knowingly makes any false statement or report ... for the purpose of influencing in any way the action of ... any bank the deposits of which are insured by the Federal Deposit Insurance Corporation ... upon any application, advance, discount, purchase, purchase agreement, repurchase agreement, commitment, or loan, or any change or extension of any of the same, by renewal, deferment of action or otherwise, or the acceptance, release, or substitution of security therefor, shall be fined not more than $5,000 or imprisoned not more than two years, or both.
 
 
 [19]
 The version of 18 U.S.C. Sec. 1344 that was in effect when the Falcones were indicted states, in pertinent part:
 (a) Whoever knowingly executes, or attempts to execute, a scheme or artifice--
 (1) to defraud a federally chartered or insured financial institution; or
 (2) to obtain any of the moneys, funds, credits, assets, securities or other property owned by or under the custody or control of a federally chartered or insured financial institution by means of false or fraudulent pretenses, representations, or promises, shall be fined not more than $10,000, or imprisoned not more than five years, or both.
 In 1989, Congress amended section 1344, in the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), Pub.L. No. 101-73, Title IX, Sec. 961(k), 103 Stat. 183, 500.
 
 
 [20]
 18 U.S.C. Sec. 2113(b) states, in pertinent part:
 Whoever takes and carries away, with intent to steal or purloin, any property or money ... of value exceeding $100 belonging to, or in the care, custody, control, management, or possession of any bank ... shall be fined not more than $5,000 or imprisoned not more than ten years, or both.
 
 
 [21]
 18 U.S.C. Sec. 2113(a) states, in pertinent part:
 Whoever enters or attempts to enter any bank ... with intent to commit in such bank ... any felony affecting such bank ... and in violation of any statute of the United States, or any larceny--
 Shall be fined not more than $5,000 or imprisoned not more than twenty years, or both.
 
 
 [22]
 Both Falcones challenge their 18 U.S.C. Sec. 2113(a) convictions for entering a bank with the intent to commit a felony affecting the bank. These counts are based on their presentations of false corporate resolutions to Barnett Bank and NCNB in violation of 18 U.S.C. Sec. 1344(a)(2). Because they maintain that these presentations did not violate section 1344(a)(2), they also argue that their convictions under section 2113(a) cannot stand
 
 
 [23]
 For the text of section 371, see supra note 16
 
 
 [24]
 The court in Hope I rejected Hope's claim that the conspiracy count of the indictment was duplicitous--because it charged him under both the defraud and offense clauses of section 371 in a single count, see Fed.R.Crim.P. 8(a) (each crime must be charged in separate count of indictment); United States v. Ramos, 666 F.2d 469, 473 (11th Cir.1982) ("The error of duplicity is present where more than a single crime is charged in one count of an indictment.")--and should therefore be dismissed. Hope I, 861 F.2d at 1578 n. 8. ("While it is true that courts have interpreted the ... clauses of Sec. 371 as separate criminal offenses, it is well established that a single conspiracy count may properly allege multiple objectives.... Count I alleges a single conspiracy in violation of Sec. 371, with two separate objects, and is not duplicitous." (citations omitted)); see also Smith, 891 F.2d at 711-13. But see Haga, 821 F.2d at 1043 (reaching opposite conclusion)
 Without addressing the merits of this determination by the Hope I court, we note that the Hope I court did not have to decide whether the portion of count one of the indictment that charged Hope with violating the offense clause of section 371 was valid; it simply could have ordered the government to delete, pursuant to Tanner, that portion of the count which charged a violation of the defraud clause and allowed the jury to consider the offense charge. Such a deletion would have been a lawful amendment to the indictment, whether the indictment was duplicitous or simply charged one conspiracy to commit two offenses. See United States v. Diaz, 690 F.2d 1352 (11th Cir.1982) (when government charged defendants in single count for conspiring to violate two different federal statutes, but abandoned one conspiracy charge before trial and so revised the indictment, no unlawful amendment had occurred; "[a]n indictment may charge a conspiracy with more than one distinct substantive offense, and the withdrawal of distinct portions of such a conspiracy charge from jury consideration is permissible, if the effect is to narrow the issues a defendant is called upon to meet" (citations omitted)); United States v. Hicks, 529 F.2d 841, 843 (5th Cir.) (trial court properly ordered government to elect one charge in duplicitous count of indictment and to submit reformed indictment conforming to election; "[c]harges may be dropped from an indictment any time before submission to the jury"), cert. denied, 429 U.S. 856, 97 S.Ct. 154, 50 L.Ed.2d 133 (1976); see also United States v. Miller, 471 U.S. 130, 145, 105 S.Ct. 1811, 1819-20, 85 L.Ed.2d 99 (1985) ("where an indictment charges several offenses, or the commission of one offense in several ways, the withdrawal from the jury's consideration of one offense ... does not constitute a forbidden amendment of the indictment").
 
 
 [25]
 18 U.S.C. Sec. 641 states, in pertinent part:
 Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, ... any record, voucher, money, or thing of value of the United States or of any department or agency thereof...
 ....
 Shall be fined not more that $10,000 or imprisoned not more than ten years, or both....
 
 
 [26]
 For the text of section 1344, see supra note 19
 
 
 [27]
 18 U.S.C. Sec. 1341 states, in pertinent part:
 Whoever, having devised ... any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, ... for the purpose of executing such scheme or artifice or attempting so to do, [uses the United States mail], shall be fined not more than $1,000 or imprisoned not more than five years, or both.
 18 U.S.C. Sec. 1343 states, in pertinent part:
 Whoever, having devised ... any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more that $1,000 or imprisoned not more than five years, or both.
 
 
 [28]
 Courts have read both the mail fraud statute, 18 U.S.C. Sec. 1341, and the wire fraud statute, 18 U.S.C. Sec. 1343, as forbidding both schemes to defraud that do not involve false pretenses or representations, and schemes to defraud by means of such false pretenses or representations. See, e.g., United States v. Scott, 701 F.2d 1340, 1343 (11th Cir.), cert. denied, 464 U.S. 856, 104 S.Ct. 175, 78 L.Ed.2d 158 (1983) (mail fraud); United States v. Cronic, 900 F.2d 1511, 1513 (10th Cir.1990) (mail fraud); United States v. Rafsky, 803 F.2d 105, 108 (3rd Cir.1986), cert. denied, 480 U.S. 931, 107 S.Ct. 1568, 94 L.Ed.2d 760 (1987) (mail and wire fraud); United States v. Clausen, 792 F.2d 102, 104-05 (8th Cir.), cert. denied, 479 U.S. 858, 107 S.Ct. 202, 93 L.Ed.2d 133 (1986) (wire fraud)
 
 
 [29]
 For the text of 18 U.S.C. Sec. 1014, see supra note 18
 
 
 [30]
 We note, however, that a check-kiting scheme may be criminal under 18 U.S.C. Sec. 1344(a)(1), which prohibits a scheme to defraud a bank but does not require the government to show that the defendant made a false representation, see Schwartz, 899 F.2d at 246; Bonnett, 877 F.2d at 1454-56; Rafsky, 803 F.2d at 107 n. 1 (dictum), and that such a scheme also may be criminal under the mail and wire fraud statutes so long as the government does not rely on the parts of those statutes that prohibit fraud by means of false representations, see Cronic, 900 F.2d at 1514 ("check kiting constitutes a scheme to defraud under mail fraud statute, as well as the wire and bank fraud statutes"); Rafsky, 803 F.2d at 107 (wire fraud); cf. United States v. Freitag, 768 F.2d 240 (8th Cir.1985) (mail fraud); Clausen, 792 F.2d at 105 (payment of debt with bad check was scheme to defraud under wire fraud statute)
 
 
 [31]
 A sight draft is an instrument payable on presentment. H. Black, Law Dictionary 1238 (5th ed. 1979)
 
 
 [32]
 See also United States v. Bonnette, 781 F.2d 357, 365 (4th Cir.1986) (similar sight drafts representing false automobile sales were false statements under 18 U.S.C. Sec. 1014); cf. United States v. Gunter, 876 F.2d 1113, 1116 (5th Cir.) (defendants made false statements, under sections 1344(a)(2) and 1014, when they presented banks with titles to cars they did not own as collateral for loans), cert. denied, --- U.S. ----, 110 S.Ct. 198, 107 L.Ed.2d 152 (1989)
 
 
 [33]
 In Prushinowski, 562 F.Supp. at 156-58, the court found that checks made out by the defendant but signed with illegible, fictitious, or unauthorized signatures of third parties contained false statements in violation of 18 U.S.C. Sec. 1014. See also United States v. West, 666 F.2d 16 (2nd Cir.1981) (analogous pre-Williams case recognizing that defendant who, assertedly without authorization, signed ex-wife's name to loan documents, was properly charged with making false statement under section 1014, but reversing conviction because government did not rebut defendant's claim that he reasonably believed he was authorized to sign for wife)
 
 
 [34]
 In Worthington, 822 F.2d at 315, the defendant submitted a check to the Internal Revenue Service that was drawn on a fictitious bank. The Second Circuit affirmed his conviction under 18 U.S.C. Sec. 1001, which prohibits making false statements to a federal agency in connection with a matter in that agency's jurisdiction; it found that "the submission of a check drawn on a nonexistent bank is a representation that the bank exists."
 
 
 [35]
 In Price, 763 F.2d at 643, the Fourth Circuit found that false names, amounts, account numbers, and signatures on credit card slips presented for deposit were false statements under 18 U.S.C. Sec. 1014
 
 
 [36]
 Fla.Stat. Sec. 607.111(1) provided, in pertinent part:
 All corporate powers shall be exercised by or under the authority of, and the business and affairs of a corporation shall be managed under the direction of, a board of directors, except as may be otherwise provided ... in the articles of incorporation. If any such provision is made in the articles of incorporation, the powers and duties conferred or imposed upon the board of directors by this chapter shall be exercised or performed to such extent and by such person or persons as shall be provided in the articles of incorporation.
 One commentator notes that although statutes such as section 607.111(1) seem to justify dispensing with a board if the shareholders so desire, "the idea that a board of directors is an essential item in a corporation is so firmly engrained in the thinking of many courts and of most officials with whom [articles of incorporation] must be filed, that an attempt to dispense with the board might run into difficulties" without more specific statutory authorization. 1 O'Neal's Close Corporations, supra note 1, Sec. 3.60, at 100. We have uncovered no Florida law addressing the scope of section 607.111(1); we assume that Florida would interpret this section to allow the shareholders to manage a corporation if the articles so provided.
 
 
 [37]
 It is unclear in what order the issue of stock, the election of the board, the appointment of officers, and the passage of the banking resolution occurred: the January 15 minutes first describe the election of officers, next memorialize the passage of the banking resolution, then indicate that directors were elected, and finally note that the corporation accepted the shareholders' offers to purchase shares. Sandra Falcone and Duke Peay testified that stock certificates were not signed and distributed until early February, although the stock certificates themselves are dated January 15. Other witnesses testified that they were unsure when the stock was issued, how many organizational meetings occurred, and what was decided at each meeting. All agreed that the minutes were not completely accurate; they appear to have been prepared by a paralegal who was not present at any of the meetings. Robert Falcone argues, from this evidence, that nothing described in the minutes as occurring before the shareholders received stock was a valid corporate action. The election of directors, appointment of officers, and passage of the banking resolution, therefore, were void, and all management power remained in the hands of the shareholders under the articles. We disagree
 OGA was a close corporation, with a few shareholders who also served as its directors. Florida law tolerates informalities in the operation and organization of close corporations. See Etheredge, 102 So.2d at 663 (when all directors and stockholders of close corporation met informally, decision made at meeting "should be regarded as the action of the directors and accorded such legal effect"; "[t]he doctrine of permitting closed corporations to act informally is recognized as an exception to the general rule that directors must act as a board at duly convened meeting[s].... [C]orporations which include only a few stockholders do not often act with as much formality as larger companies."); see also Frank v. Anthony, 107 So.2d 136, 138 (Fla.Dist.Ct.App.1958); cf. Zinger v. Gattis, 382 So.2d 379, 380 (Fla.Dist.Ct.App.1980) (when close corporation never held meeting to issue stock, and engaged in few formalities, person could nonetheless have interest in corporation when it appeared that he was an intended shareholder; "[m]ere irregularities or informalities of a stock issuance do not render the stock void").
 Taking the evidence in the light most favorable to the Government, as we must in judging the sufficiency of evidence on appeal, all of the shareholders (except Walker, who was represented at the meetings by Wayne Dent) met in early 1985, elected themselves plus Dent as a board of directors, appointed officers, and passed corporate resolutions. Alternatively, the shareholders may have ratified the actions they took before they received their stock by continuing to act as a board of directors, allowing the officers to continue to manage the corporation, and, in accordance with the banking resolution, opening accounts with Orange State that required two signatures.
 
 
 [38]
 Our holding is limited to the context of a criminal prosecution under section 1344(a)(2); because Sandra Falcone did not have authority, as shareholder, director, or officer, to stamp the checks, the Falcones' presentations of checks bearing the stamps were false representations. We do not decide whether Sandra Falcone had some apparent authority to use the stamp or whether the bank was negligent in relying on that apparent authority and paying the checks
 
 
 [39]
 She could not, therefore, authorize her husband to stamp the checks on her behalf. We note that Robert Falcone does not argue that his own undefined management or oversight position in OGA gave him the authority to authorize the use of and use Peay's signature stamp without Peay's permission. We doubt that such an argument could succeed, as it would vitiate the corporate resolution requiring two signatures on the accounts by permitting one of the required signatories to withdraw money without the consent of the other
 
 
 [40]
 The trial testimony showed that Sandra and Robert Falcone opened many of OGA's legitimate accounts and filed corporate resolutions with them even though no meeting of the board, formal resolution in the minute book, or formal shareholder action authorized them to do so. The resolutions filed with these legitimate accounts may have been valid actions of the shareholder/directors, if a majority of them informally authorized Sandra Falcone to open legitimate corporate accounts and file corporate resolutions with those accounts requiring two signatures on each transaction, see Etheredge, 102 So.2d at 663 (close corporation shareholder/directors' agreement, at informal meeting, was "action of the directors"), or, alternatively, these resolutions may have been unauthorized and therefore invalid. Because the Falcones were charged with no criminal violations based on these actions, we do not decide this question
 
 
 [41]
 We find only that the resolution filed at the Barnett Bank, because it was outside the scope of Sandra Falcone's authority as shareholder, director, or officer, and because it was a material misrepresentation, was a false or fraudulent representation under section 1344(a)(2). We do not decide whether Sandra Falcone had some apparent authority to file such a resolution at the bank or whether the bank was negligent in accepting such a resolution from her
 
 
 [42]
 Because we affirm the Falcones' section 1344(a)(2) convictions, for presenting false corporate resolutions to Barnett Bank, we also affirm their 18 U.S.C. Sec. 2113(a) convictions for entering a bank with the intent to commit a felony in connection with this violation of section 1344(a)(2)
 
 
 [43]
 For the text of section 2113(b), see supra note 21